UNITED TELEPHONE COMPANY OF
IOWA, Appellant,

v.

IOWA STATE COMMERCE
COMMISSION, Appellee.

No. 57078.

Supreme Court of Iowa.

Aug. 31, 1977.

Rehearing Denied Oct. 14, 1977.

J. Richard Smith, Overland Park, Kan., and Korf, Diehl, Clayton & Cleverley, Newton, for appellant.

Don Charles Uthus, Commerce Counsel, Philip B. Malter, Commerce Solicitor, James R. Maret, Assistant Commerce Counsel, Des Moines, for appellee.

Heard before MOORE, C. J., and MASON, UHLENHOPP, HARRIS and McCORMICK, JJ.

MASON, Justice.

Plaintiff, United Telephone Company of Iowa (the Company), seeks by appeal to this court review of the judgment of the Jasper District Court which affirmed in all respects the May 1, 1972, Decision and Order of the Iowa State Commerce Commission denying plaintiff's proposed rate increase, requiring filing of revised rates and refund of all sums collected under bond. Section 490A.19, The Code, 1971. Chapter 490A was renumbered by the code editor as chapter 476, The Code, 1977, and sections 490A.14 to 490A.19 were repealed by the 1974 Regular Session of the Sixty-fifth General Assembly, chapter 1090, section 211.

August 1, 1969, the Company filed with the Iowa State Commerce Commission (the Commission) an application to revise the telephone rates charged to its subscribers in the state of Iowa, including Jasper County. In this rate application, as subsequently modified and refiled with the Commission

August 29, the Company requested an increase in its revenue in the sum of $559,-693.00 per annum.

The proposed rates were suspended by the Commission September 23, 1969, pending determination of their reasonableness and legality. The proposed rates became effective January 1, 1970, under Company bond but were subject to refund with interest thereon in the event they were determined to be unjust, unreasonable or unduly discriminatory.

Commission hearings concerning the Company's application were held on September 14, 15 and 16 and November 10, 11 and 12, 1971. The relevant details of those hearings and analysis of the Commission's decision will be set forth as they become necessary in a consideration of the issues presented herein.

Pursuant to the provisions of section 490A.13, The Code, 1971, the Company filed notice of appeal from the order of the Commission with the Jasper District Court. After considering the record made before the Commission and the briefs and oral arguments of the parties, the trial court entered an order January 18, 1974, affirming the Commission's order. February 8 the Company filed notice of appeal to this court. Pursuant to the Company's request and without objection from the Commission this court issued a stay order February 27 permitting the Company to collect its proposed rates pending disposition of this appeal.

The Company is one of 20 operating telephone companies comprising the United Telephone System, the third largest telephone system in the United States, and is subject to the jurisdiction of the Commission. United Utilities, Inc. owns all the stock of the Company and substantially all the stock of the other operating subsidiaries.

United System Service provides administrative, professional, financial, engineering and advisory services to the affiliates and to the parent company, United Utilities. North Electric Company, the manufacturing subsidiary, provides telephone equipment for use by its operating affiliates but is not subject to the jurisdiction of the Commission.

The following contentions are presented for this court's review:

1. The Commission, in violation of section 490A.8 which requires consideration of all valuation evidence, refused to give meaningful consideration to, and in fact excluded from consideration as a matter of policy, evidence as to the value of the Company's rate base determined by the reproduction cost method of valuation.

2. The Commission erred in eliminating from the Company's rate base the costs incurred in establishing a continuing property record system as required by Commission order.

3. The Commission erred in reducing the Company's rate base by the amount of deferred income taxes on the books of North Electric Company, a non-regulated supplier affiliated with the Company, attributable to profits on inter-company sales.

4. The Commission's adjustments to the Company's capital structure were unsupported by substantial evidence and therefore arbitrary and capricious amounting to a denial of equal protection of the law.

As a preliminary matter, the following instructive comments from *Davenport Water Co. v. Iowa State Commerce Com'n.,* 190 N.W.2d 583, 588 (Iowa 1971), are set out:

" 'Rate base' represents the total investment in property, used and useful at time of the rate inquiry, in rendering a designated utility service. That figure is multiplied by a percentage called 'rate of return' which orthodox regulation allows the utility to earn. * * * [citing authorities].

"The methods most commonly employed in ascertaining a rate base are, (1) 'original cost depreciated or prudent investment', (2) 'present reproduction cost or fair value.'

"A rate base determined by 'original cost depreciated or prudent investment' usually consists of original cost of the property used or useful in rendering services, plus working capital, less accumulated depreciation

and contributions to construction and capital. This is ordinarily determined by an analysis of the utility's books and records. * * * [citing authorities].

"Under 'present reproduction cost or fair value' method the rate base is customarily derived by considering and evaluating original cost of a utility's existing facilities devoted to public service, present reproduction cost new of the facility less depreciation, and the amount and value of outstanding stocks and bonds. In effecting this computation, estimates based in part on price and labor indices, and extant values are commonly put to use. * * * [citing authorities]."

■ I. The Commission raises an issue concerning the appropriate scope of this court's review. It is urged the Company is not entitled to "two chances" to overturn the Commission's decision and therefore this court's scope of review is limited. Specifically, the Commission contends the only question before this court is whether the trial court applied appropriate principles in originally reviewing the Commission's decision. However, contrary to the Commission's position as the following statements from *Davenport Water Co.,* 190 N.W.2d at 590–592, demonstrate, this court reviews the actions of the Commission and is not limited to a review of the principles applied by the trial court:

"At the threshold * * *, Section 490A.8, provides in material part: 'The burden of proof shall be on the public utility to prove that no unreasonable profit is made.'

"This must mean, a presumption of reasonableness attends Commission's determined rate return, and the burden is upon Utility to prove otherwise.

" * * *

"And §§ 490A.13–490A.16 provide for appeal to the district court by an aggrieved party, with attendant appellate procedures.

"Then § 490A.17 states:

" 'The court may dismiss the appeal, modify or vacate the order complained of in whole or in part, or remand the matter to the commission for such further proceed-

ings as justice may require. The court shall have jurisdiction to compel commission action unlawfully withheld or unreasonably delayed and the court shall have the power to set aside the commission action, findings and conclusions found to be:

" '1. Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

" '2. Contrary to constitutional right, power, privilege or immunity.

" '3. In excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

" '4. Unsupported by substantial evidence in view of the entire record as submitted.'

"Also § 490A.19 says:

" 'Any party may secure a review of any final judgment of the district court by appeal to the supreme court. Such appeal shall be taken in the manner provided by law governing appeals from the district court in other civil cases.' * * *

" 'Clearly a review anew is not contemplated.' *Nishnabotna Valley Rural Elec. Coop. v. Iowa P. & L. Co.,* 161 N.W.2d 348, 353 (Iowa).

"In cases such as this our review is akin to those brought before us involving workmen's compensation controversies.

" * * * :

" 'The commissioner's findings of fact have the effect of a jury verdict and, where the evidence is in dispute or where reasonable minds may differ on inferences fairly to be drawn from the disclosed facts, the commissioner's findings of fact are conclusive on appeal. On the other hand, if there is no dispute in the facts and different inferences could not be fairly drawn from them, a question of law is presented and the court is not bound by the commissioner's findings and conclusions. (Authorities cited).

" 'Our duty, then, is to determine whether there is sufficient competent evidence to warrant the decision the commissioner made, not whether there is sufficient evi-

dence to warrant a decision he did not make. (Authorities cited).

" 'The commissioner, not the court, weighs the evidence, and his findings will be broadly and liberally construed to uphold rather than defeat his decision. (Authorities cited).' * * *

"Instantly Commission is the finder of fact, it being for us to ultimately determine, (1) issues of law, (2) whether Commission acted unreasonably, arbitrarily, capriciously, in violation of applicable constitutional standards, or in excess of statutory authority, and (3) whether its findings are supported by substantial evidence of record. See Code § 490A.17, quoted above. Our limited factual review is as it should be, since Commission presumably has at its disposal the facilities and expertise with which to appropriately resolve detailed and complicated fact questions. This means we can intercede only when Commission is clearly shown to have acted unconstitutionally, in violation of statutory mandate, or absent substantial support in the record. * * * [citing authorities]."

■ II. At this point, another of the Commission's preliminary contentions may be summarily dismissed. It is argued the Company is precluded from relief herein by reason of its failure to appeal from the district court's determination the rate of return allowed by the Commission was "adequate, just and reasonable." However, the Company's appeal is not concerned with the rate of return; rather, it is concerned with the rate base, a wholly distinct computation. The Commission's contention is clearly erroneous.

III. Section 490A.8, The Code, 1971, provided in part as follows:

" * * * In determining reasonable and just rates, the commission *shall consider all factors relating to value* * * *." (Emphasis supplied).

The Company contends the Commission, in violation of section 490A.8, refused to give meaningful consideration to, and in fact excluded from consideration as a matter of policy, evidence bearing upon the value of the Company's rate base determined by the reproduction cost method of valuation. In support of its argument the Commission violated the mandate of section 490A.8, the Company directs this court's attention to the following language from *Davenport Water Co.*, 190 N.W.2d at 613:

"We have already noted Commission was justified under this record in rejecting the fair value [reproduction cost] evidence introduced by Utility. In doing so Commission clearly announced its 'philosophy' that fair value evidence should not be relied on in future rate-making cases. We repudiate this gratuitous declaration. Commission is obligated to consider such evidence under Code section 490A.8. Whether it should then be accepted and applied as having probative force is not to be determined in advance as a policy decision. It is rather a matter to be decided by Commission as the fact finder in each case as the circumstances dictate."

The Commission contends the Company failed to preserve error, if any, on this issue by submitting original cost rate base data to the Commission and by failing to object to the use thereof in establishing a rate base. The Commission's argument is without merit. The Company was required by the Commission rules to submit such information with its proposed rate increase. 15.-4(6) I.D.R. 1971, page 137. In addition, the Company does not contend it was error to use original cost data but maintains it was error to summarily reject reproduction cost evidence. Therefore, contrary to the Commission's position, the merits of the Company's contention must be considered.

In its decision and order herein, 94 P.U. R.3d 437, the Commission made the following statements with respect to the Company's reproduction cost evidence:

"As we stated in *Davenport Water* [76 P.U.R.3d 209] there are many transparent defects in using a reproduction cost new approach including the assumption that the property will be reproduced exactly as it exists. It is obvious that many items in plant could not be reproduced and that technology advances are being made con-

stantly, continually rendering some present equipment obsolete. Subjective judgments are made regarding pricing, construction methods, time involved and as a result forms a soft foundation which inevitably causes concern as to the validity of the final work product. While we find other infirmities with the use of the reproduction-cost-new approach the foregoing reasons are sufficient for us to conclude that this method is of little value in our search for a proper rate base.

" * * *

"In the instant proceeding the Company's cost of capital witness makes only a pass at adjusting his return figures to account for the inflation inherent in a fair value [reproduction cost] rate base. * * *

"Since inflation is represented in a fair value rate base and is also included in cost of capital computations, unless the inflation factor is deducted from the rate of return to be applied to a fair value rate base, adoption of such a rate base would result in the stockholder receiving an unjust double return for inflation. * * * [citing authority].

"There can be no doubt that debt costs vary with inflation; and since the Company as well as the Staff used actual imbedded cost of debt figures without attempting to deduct inflation, to use a fair value rate base together with such debt figures could result in the aforementioned double return.

"Similarly, no attempt was made to determine the extent to which observed cost of equity includes inflation; nor, of course, was an effort made to account for such effects in conjunction with the proposed fair value rate base.

"From the above, it follows that aside from the inherent infirmities in fair value estimates, at best such evidence as it exists in this proceeding is incomplete."

In addition, at one point the Commission refers to the fair value or reproduction cost method of valuation as "speculative, difficult in its administration and imprecise."

The Commission does not deny the Company's reproduction cost evidence was ob-jected to as immaterial at the hearing held September 16, 1971, herein and said objection was sustained. The testimony and exhibits were then admitted as an offer of proof for the purpose of making the record for later judicial review if necessary.

The next hearing before the Commission was held November 10. At that time the Company was granted permission to reopen its case for the purpose of offering into evidence the testimony of J. D. Russell dealing with reproduction costs.

The Commission maintains the filing of this court's opinion in *Davenport Water Co.* on September 27, 1971, prompted a reconsideration of the sustained objection and a consideration of the Company's reproduction cost evidence in the Commission's decision and order. The Commission argues that consideration led to a rejection of the reproduction cost evidence on the basis of the lack of probative value evidenced thereby.

The Company maintains the Commission rejected its proffered evidence on the basis of alleged infirmities inherent in all reproduction cost evidence. Consequently, the Company requests a remand with directions compelling the Commission to give meaningful consideration to the reproduction cost evidence in accordance with section 490A.8, as interpreted by *Davenport Water Co.*

In *Davenport Water Co.*, 190 N.W.2d at 595, this court cited with approval the following definitions of "consider":

"Black's Law Dictionary (rev. 4th ed.), at 378, says 'consider' means: 'To fix the mind on, with a view to careful examination; to examine; to inspect.'

"And 15A C.J.S., at 581, states:

" 'In its primary sense, "consider" has been defined as meaning to think; to examine or to inspect; to fix the mind on with a view to a careful examination; to judge; to entertain or give heed to; to deliberate about and ponder over; to give close attention to, to think deliberately about, to think on or over with care, to meditate on, to reflect upon, to revolve, to study, to ponder,

as to consider the matter well before deciding.'"

As stated, the Company asserts the Commission, in violation of section 490A.8, refused to give meaningful consideration to, and in fact excluded from consideration as a matter of public policy, evidence bearing upon the value of the Company's rate base determined by the reproduction cost method of valuation. As we understand, this contention is based on the theory the foregoing concept of "consider" was employed by the legislature to express its intent the Commission should receive evidence bearing on reproduction cost and resolve its competency and weight as a factor for determination of a rate base. The Company insists its evidence relating to reproduction cost was not so treated in the present case.

■ Although the cost of reproduction less depreciation is not the sole criterion, it is nevertheless one of the elements which is to be considered in determining the reasonable value of a utility's property for ratemaking purposes. See section 490A.8 and *Davenport Water Co.,* 190 N.W.2d at 613.

Of course, the probative value of such evidence is to be determined by the Commission since " * * * the legislature did not intend to bind defendant regulatory agency to any single formula or formulae regarding the rate base to be employed. Under existing legislation, and within constitutional limitations, Commission was and is free to adopt any rate base method deemed appropriate for determination of value upon which to fix a return rate." *Davenport Water Co.,* 190 N.W.2d at 599.

The Company argues the fact testimony bearing on reproduction cost was ultimately admitted into evidence at the hearing before the Commission on November 10 after this court's decision in *Davenport Water Co.* does not necessarily mean such evidence was given meaningful consideration by the Commission in reaching its decision.

Hence, the first question presented is whether the Commission gave meaningful consideration to the Company's evidence relating to reproduction cost as required by the statute. The second is whether the Commission had valid reasons for eliminating the Company's evidence relating to reproduction cost as being without sufficient weight to constitute a reasonable basis for the establishment of increased rates.

We have set out statements in the Commission's order of May 1 relative to the Company's reproduction cost evidence which furnish some basis for the Company's contention the Commission was "predisposed to reject certain evidence submitted by the Company" relative to reproduction cost without giving it the meaningful consideration required by the statute.

However, the following portion of the Commission's order of that date supports the view the Commission did "abide by its statutorily imposed duty to 'consider all facts relating to value' when establishing earnings the Company is permitted to realize":

"The Company presented rate bases as of December 31, 1968 and December 31, 1970 based on reproduction cost new less depreciation (RCN) valuations prepared by the American Appraisal Company.

"Both the 1968 and 1970 RCN valuations originated with a basic record of physical inventories as of December 31, 1964, which have been maintained by regular work order procedures since that date. Verification was made of the updating of records by review of work orders and by field inspections.

"Groups of poles, wire, and cable at approximately 25 locations were selected at random for field checking to verify the inventory and observe the condition of outside plant.

"Three methods were used to develop a reproduction cost of the property. The first method consisted of applying 1968 unit costs to an inventory of the property in service. This inventory unit price method was used for the major part of the telephone system. A second method provided for the development of the current cost of some accounts by the use of cost trends applied to the Company's book investment.

The third method pertained to the remaining accounts which were included at book cost on the basis that the reproduction cost is at least equal to or greater than the book cost. The determination of the method to be used was made on the basis of records available and the practicality of unit pricing versus trending. Approximately 85% of the reproduction cost was valued by unit pricing. This method of determining cost was used for central office equipment, station equipment and connections, and outside plant.

"It was assumed that the Company's entire property would be reproduced in its existing form as a single large scale construction project in order to determine the reproduction cost unit prices. This permitted the use of prices for large volume purchases of major telephone plant components. Direct material overhead costs ranged from 8% to 12%, depending on differences in storage expense and contractors' fees. Total labor indirect costs were determined to be 32.8% of the basic wage rate. The provision for general indirect costs, such as engineering, interest during construction, legal and administrative, etc., varies between accounts, ranging from 5.0% to 13.62%.

"Reproduction cost new values for about 12% of the Company's property were obtained by trending. This method was used because it was concluded that the cost of making a detailed physical inventory and applying unit prices for this portion of the Company's property would have been disproportionately high. The trend factors used were developed by the American Appraisal Company.

"Use of the above methods resulted in a reproduction cost new of the Company's property at December 31, 1968 of $28,078,501. Updating this valuation to December 31, 1970 included deducting retirements at 1968 cost levels and adjusting the remaining property in the 1968 appraisal as well as the 1969 and 1970 additions to cost levels prevailing at December 31, 1970. This produced a total reproduction cost new at December 31, 1970 of $34,527,166.

"The appropriate depreciation deductions applicable to these reproduction cost new values included observed physical deterioration and obsolescence due to technological advances. Thus, although older equipment, which may be obsolete or partially so, is priced at current costs in the reproduction cost new valuation, the obsolescence factor is allegedly recognized in the provision for depreciation. On this basis it was determined that the reproduction cost new less depreciation at December 31, 1968 and December 31, 1970 was $21,692,764 and $28,078,403, respectively."

■ Contrary to the Company's contention the court concludes the Commission gave the Company's evidence relating to reproduction cost meaningful consideration in accordance with the requirements of section 490A.8 when reaching its decision establishing the rate base for the Company.

It is likewise our view in light of that portion of the Commission's order of May 1 set out first in division III the Commission stated valid reasons for rejecting such evidence as being without sufficient weight to constitute a reasonable basis for the establishment of increased rates.

The Company's request for a remand on the basis of matters considered in this division is denied.

IV. Following the initiation of regulation of telephone companies in Iowa the Commission adopted most of the F.C.C. Rules of Accounting, which require, among other things, companies to establish and maintain a continuing property record (CPR) system. The Company established and maintained such a system and included 80 percent of the total cost involved in establishing that system in its rate base. In other words, the Company capitalized that amount relying upon the advice of a consultant who determined the expenditures involved therein were indeed capital items. The Commission, however, determined such expenditures were not plant investment and consequently were expense rather than capital items. Accordingly, the Company was ordered to reclassify those

cost items and was only allowed to amortize them over a 15-year-period. The Company contends the action of the Commission is unsupported by the evidence of record, constitutes a taking of property without due process of law and was arbitrary and capricious.

A CPR system is a continuing record of the property owned by a company. Much of the cost involved in establishing and maintaining a CPR system arises from engineering, accounting and data processing services.

The Company argues its capitalization of 80 percent of the original cost of the CPR system, which amounts to $348,462 and represents the engineering costs sustained therein, is justified by the "fact" that the day-to-day costs of maintaining the system are similarly treated with the Commission approval. However, the latter "fact" is not substantiated by the record. As the Commission points out, the portion of the transcript the Company relies upon to establish that the day-to-day costs of maintaining the CPR system are 80 percent capitalized in fact merely establishes that engineering services related to construction in progress are capitalized. No mention is made of the Commission approval of the capitalization of day-to-day CPR system costs.

■ The Company assigns significance to the fact a CPR system is beneficial to the Company, the Commission and ratepayers. However, designating an expenditure as "beneficial" does not resolve the question whether that item should be capitalized or should be more properly deemed an expense item.

The Commission's determination of the appropriate treatment for the CPR system costs was based upon an examination of the F.C.C. Rules of Accounting and the National Association of Regulated Utility Commissioners Uniform System of Accounts for Electric, Gas and Water Utilities. Reliance is placed upon the fact the former does not enumerate a plant-in-service account for CPR system costs and the latter appears to at least inferentially support the position CPR system costs are an expense item.

With reference to the Commission's treatment of the CPR system costs, the district court held:

" * * * It is consistent with the method used for electric, gas and water utilities under the provisions of National Association of Regulated Utility Commissioners (NARUC classification of accounts. There is nothing arbitrary in the handling of this expense by the Commission. The above testimony and other evidence in the record justify the exclusion of the amount from plant investment and support the allowance of its recovery over the stated period of fifteen years."

■ As previously pointed out, the Company has the burden of proof herein. *Davenport Water Co.*, 190 N.W.2d at 590. It is our view that burden has not been carried. The Company has not established by a preponderance of the evidence that the Commission's action was arbitrary and capricious and is not supported by substantial evidence of record. The Company's due process contention is founded upon the conclusion the CPR system costs are in fact plant-in-service. Since such a conclusion is not supported by the record herein the constitutional issue need not be confronted.

V. The Company purchases many of its capital items and supplies from North Electric Company, an affiliated supplier. These capital expenditures are allocated to the Company's plant-in-service account at original cost. As the Company depreciates these items over their useful lives North Electric recognizes the tax on the profits made from the sales at a similar rate. This method of tax deferral is mandated by Treas.Reg. § 1.1502–13(d).

Prior to November 15, 1966, utility companies and affiliated suppliers were able to execute closing agreements with the Internal Revenue Service under the provisions of Treas.Reg. § 1.1502–13(j). Apparently, under such an agreement inter-company profits are not recognized and the tax savings produced thereby flow back to the purchasing utility in the form of cash which reduces the original cost of the capital items

purchased. The Company and North Electric had never executed such an agreement.

In reducing the Company's rate base by the deferred taxes on North Electric's books, which were due to purchases by the Company from North Electric, the Commission stated:

"The Company objected to the inclusion of the computed deferred taxes on inter-company mark-ups on capitalized items purchased by the Company from North Electric Company, an affiliated supplier, as part of the deferred income tax credits deducted from the rate base. The amounts of $237,-599 and $442,629 were based upon computations furnished by Company personnel. The Company does not include such deferred taxes on its books. The Company maintains that the F.C.C. accounting rules, which are required by the Commission, do not require a different treatment than that used by the Company. It developed that the Company's treatment of this item was based upon the fact that the Company had not entered into a closing agreement with the Internal Revenue Service concerning inter-company tax deferrals.

"The Company admitted that companies with closing agreements handled inter-company profits in the same manner as that used by the Staff. We perceive no real significance attaching to whether or not a closing agreement has been signed. It has long been established that the treatment of taxes for rate-making and book purposes are not necessarily the same."

The Company contends the Commission's action was contrary to section 490A.8, in excess of the Commission's statutory jurisdiction, arbitrary and capricious and amounted to a taking of property without due process of law.

The Commission points out the Company and North Electric joined with other affiliates and their parent in filing a consolidated income tax return whereby the previously mentioned tax deferral resulted. The Company's parent requires its subsidiaries to pay taxes as though the deferred taxes were actually being paid in the year when the sales were made. Thus, the Commission argues any benefit from the deferred taxes is denied the Company and its ratepayers and is felt by shareholders of the manufacturing affiliate. The Commission maintains reasonable and just utility rates, as required by section 490A.8, cannot be computed without an adjustment to reflect the management decision concerning deferred taxes. To ignore such a fact, it is argued, would permit the Company's parent to benefit at the expense of the Company's ratepayers.

Section 490A.8 provides:

"Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any public utility for any * * * communications services, or for any service rendered or to be rendered in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful. In determining reasonable and just rates, the commission shall consider all factors relating to value * * *.

"The commission, in determining the value of materials or services to be included in valuations or costs of operations for rate-making purposes, may disallow any unreasonable profit made in the sale of materials to or services supplied for any public utility by any firm or corporation owned or controlled directly or indirectly by such utility or any affiliate, subsidiary, parent company, associate or any corporation whose controlling stockholders are also controlling stockholders of such utility. The burden of proof shall be on the public utility to prove that no unreasonable profit is made."

The Company maintains the second paragraph of section 490A.8 is controlling herein and points out the Commission did not argue any unreasonable profits resulted from the inter-company sales involved herein. Therefore, it is urged the Company carried its burden of proof and the Commission's action was contrary to the evidence of record.

The Company's contention is without merit. The action taken by the Commission

was not predicated upon the provisions of the second paragraph of section 490A.8; rather, it was based upon the Commission's obligation to determine "reasonable and just" rates for the Company's services. The Commission argues it would not have performed its statutorily mandated obligation had it ignored the situation produced by the Company's inter-company tax deferral scheme. The Commission's position is well taken.

In *Midwestern Gas Transmission Co. v. Federal Power Com'n*, 388 F.2d 444, 448 (7 Cir. 1968), cert. den., 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed.2d 1386, a management decision with adverse tax consequences was dealt with by the court as follows:

"We think it reasonable to understand that management decision to revert to straight-line depreciation was to choose the one method certain to result in maximum tax costs to themselves, with resulting maximum rates to the consumers. The justification for this course by management is not convincing and therein lies the basic fault which leads to the conclusion that managerial discretion has exceeded its reasonable course and compels the intrusion of regulatory intervention.

"We freely recognize, as does the Commission, that there are many areas and many situations which must remain within the jurisdiction of management. However, it has long been recognized that establishment of public utility charges involves the assessment of costs for a public service. Basic to the purpose of the Natural Gas Act is a design of regulation concerned with final adoption of rate charges fairly intended to protect the public interest. Necessarily, the area of tax policies embraces managerial decisions directly reflected in the cost of natural gas supplies for the use of the ultimate consumer. Here it seems to us quite reasonable and logical to recognize as inherent in the Commission the duty and requirement to exercise its expertise in evaluating the entire tax effect of managerial judgment. If such elected tax policies do not fairly indicate a reasonable and prudent business expense, which the consuming

public may reasonably be required to bear, following the required hearing and review procedures, then federal regulatory intervention is required."

Faced with a similar situation, the court in *City & County of San Francisco v. Public Util. Com'n*, 6 Cal.3d 119, 98 Cal.Rptr. 286, 289, 490 P.2d 798, 801–802, stated:

"Income tax expense must be considered by the commission in establishing Pacific's cost of service. * * * [citing authorities]. However, 'the primary purpose of the Public Utilities Act is to insure the public adequate service at reasonable rates without discrimination; and the commission has the power to prevent a utility from passing on to the ratepayers unreasonable costs for materials and services by disallowing expenditures that the commission finds unreasonable. (*Pacific Tel. & Tel. Co. v. Public Utilities Comm., supra,* 34 Cal.2d 822, 215 P.2d 441.)' * * * [citing authority].

"The same rule applies where the utility resorts to accounting practices which result in unreasonably inflated tax expense. * *

"The commission found that management's discretion has exceeded a reasonable and prudent course respecting income taxes to the detriment of the public interest * * *.

"Under its general power to prevent a utility from passing on to its ratepayers unreasonable costs, the commission in the instant proceeding, notwithstanding the change in the federal tax statute, could properly find that the federal income tax calculated on the basis of straight line depreciation involved an unreasonable expense and that the unreasonable expense due to such calculation was due to an imprudent management decision."

In *Southern New England Tel. Co. v. Public Util. Com'n*, 29 Conn.Sup. 253, 282 A.2d 915, 924, is the following:

"The decision as to the method to be used in determining depreciation in filing the federal income tax return and computing the tax is largely a matter for the company to determine. It may exercise its own

judgment after carefully weighing the advantages or disadvantages. That is a matter between the federal government and the company * * *. The commission, however, does exercise control over the amount which it will allow the utility for taxes for rate purposes, just as it does over any other annual allowance for expenses."

The following remarks from *Colorado Municipal League v. Public Utilities Com'n*, 172 Colo. 188, 473 P.2d 960, 967, are particularly pertinent:

"Mountain Bell argues that, since the federal law gives the taxpayer a right to choose the method of depreciation to be used, the imputation of a method not chosen by the taxpayer is beyond the power of the Commission. It is true that some courts and some commissions have subscribed to the view that it is improper to require a utility to use a particular method of depreciation when the law permits the use of any of several methods. * * * [citing authority]. In the light of the Commission's finding that the use of accelerated depreciation would benefit the customers and in light of the statutory requirement already quoted that a utility must not make unreasonable charges, we prefer to follow authorities to the contrary and rule that the Commission not only has the power but also the obligation to impute a method of depreciation which will reasonably permit a substantial saving to ratepayers. * * * [citing authority].

"Mountain Bell presents the related argument that the method of depreciation to be used is a decision to be made by management and, therefore, is beyond the purview of the Commission. * * * We are thoroughly convinced that the Bell System in general and the Mountain Bell in particular is possessed of skilled, well-trained, extremely intelligent personnel in its varied fields of management. Courts and commissions should respect the decisions of management and, in general, not succumb to the temptation of assuming the role of management. However, no matter how much deference we have and should have for highly-trained management, when that management abuses its managerial discretion to the detriment of its customers, our regulatory commissions have a duty to declare the abuse and make such orders as will give to ratepayers the advantage of those economies of which management has failed to avail itself. * * * [citing authorities]." See also, *Federal Power Com'n v. United Gas Pipe Line Co.*, 386 U.S. 237, 243, 87 S.Ct. 1003, 1007, 18 L.Ed.2d 18; *El Paso Natural Gas Co. v. Federal Power Com'n*, 281 F.2d 567, 573 (5 Cir. 1960), cert. den., sub nom. *California v. Federal Power Com'n*, 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236.

In the instant case, the Company's parent, United Utilities, Inc., made a management decision whereby the benefits of a closing agreement previously discussed were ignored. As a consequence, the Company's ratepayers prepay taxes but the benefits of tax deferral are denied them and are afforded to North Electric. Reasonable and just rates are not established by ignoring the fact such decision benefits United Utilities at the expense of the Company's ratepayers. The Company's argument it receives no benefit from the management decision ignores the facts of corporate life involved herein.

■ The Commission's decision to reduce the Company's rate base by the amount of deferred taxes on North Electric's books due to dealings between the related corporate entities is supported by case authority and the evidence herein. The Company's contentions to the contrary cannot be sustained.

VI. The Company's fourth contention involves the complex economic theory of "double leverage" and the Commission's application of that theory to the Company's capital structure. In essence, the Commission reduced the Company's book equity by approximately $3,000,000 and increased its long-term debt by the same amount, relying upon the belief the Company's capital structure should reflect the fact that all of its stock is owned by United Utilities, Inc. The Company maintains no evidence of record supports such an adjustment in its capi-

tal structure and, therefore, the Commission must have looked to extra-record evidentiary matter. In addition, the Company contends application of the double leverage theory is discriminatory in that it apparently only applies to utilities wholly owned by parent corporations.

The Commission's application of the double leverage theory came about in the attempt to determine the cost of capital and a fair rate of return on the net investment rate base of the Company.

The purpose of the cost of capital determination and the problems involved therein are explained as follows in *Lower Paxton Tp. v. Commonwealth, Pub. Util. Com'n*, 13 Pa.Cmwlth. 135, 317 A.2d 917, 921:

" * * * Another acceptable consideration in arriving at a basis for determining the fair rate of return is known as the 'cost of capital'. This is a percentage figure of the cost a public utility would be obliged to pay to obtain debt and equity capital. * * [citing authority]. The cost of capital study should give consideration to the utility's financial structure, credit standing, dividends, interest, risks, regulatory lag, wasting assets, and any peculiar features of the utility involved. * * * [citing authority]. Because of these many variables, *the cost of capital is basically a matter of judgment governed by the evidence presented and the regulatory agency's expertise*. Although the cost of capital (represented by a percentage figure) does not control what is a fair rate of return, it is certainly one of the most important bases upon which a fair rate of return is determined." (Emphasis supplied).

In *Sun City Water Co. v. Arizona Corporation Com'n*, 26 Ariz.App. 304, 547 P.2d 1104, 1109, is the following instructive language bearing upon the cost of capital determination:

" 'Capital costs' as used in rate of return cases refers to the percentage figure it would cost the utility to obtain debt and equity to obtain debt and equity capital. * * * [citing authority]. Debt cost as a part of a capital cost study is normally not a matter of dispute as it is provable as a historical fact. * * *

"The cost of equity capital is not capable of such mathematical precision and in fact is a judgment call, enlightened by consideration of all the relevant factors. However, for the purposes of this preliminary discussion, cost of equity capital is normally determined by two methods—the 'investor method', that is, an analysis of how investors form reasonable expectations of the earning-dividend and growth expectation of utility stocks or the 'opportunity cost comparative earnings method', that is, what capital would earn in other enterprises of corresponding risks and hazards.

"It is generally conceded by the parties in this case that the 'opportunity cost-comparative earnings method' is the more reliable test for determining cost of equity capital and that the 'investor's method' is primarily used as a check and guide to other measurements."

The following example from *Pennsylvania P. U. Com'n v. Pennsylvania Gas & W. Co.*, 19 Pa.Cmwlth. 214, 341 A.2d 239, 249–250, demonstrates a fair rate of return calculation utilizing the cost of capital method:

"In arriving at 7.35 percent as the fair rate of return, the PUC followed the usual method of determining the actual capital structure of the company (equity, debt and preferred stock), determining the cost for each element, and then computing the weighted cost of each. In arriving at the fair rate of return, the Commission apparently used the following statistics:

TABLE 1

| Item | Capital Structure | Cost Rate | Weighted Cost |
|---|---|---|---|
| Debt | 57% | 5.9% | 3.36% |
| Preferred Stock | 11% | 4.59% | .50% |
| Common Equity | 32% | 10.90% | 3.49% |
| Total | | | 7.35% " |

In the case before us the Commission utilized the method described above in making the cost of capital and fair rate of return determinations. Pertinent hereto are the following excerpts from the Commission's order herein:

"Both the Company and the Commission witnesses introduced testimony and exhibits

to develop the cost of money and the fair rate of return on the net investment rate base of United Telephone Company. Both witnesses computed the cost of capital by weighing and averaging the cost of all forms of the Company's net permanent capital. The historical cost of debt was determined from the records of the Company. The comparative earnings or 'opportunity cost' principle was used to determine the cost of common equity. Both witnesses agreed that the determination of the cost of common equity is not a matter of exact science but is a matter of judgment, that there are no mathematical formulas to develop such cost, and that the final determination rests on the best judgment of the Commission.

"* * *

"At the time of this proceeding all of the common stock of United Telephone of Iowa is owned by its parent holding company, United Utilities, Inc. (Parent) whose common stock is traded on the New York Stock Exchange, as well as certain regional exchanges. Therefore, in determining the adequacy of the return necessary to enable United Telephone, as a wholly owned and subsidiary company, to attract capital in competition with alternative investment opportunities, we must look to the effective return offered the market investor by reason of the parent-subsidiary relationship.

"Because of this holding-company relationship, there is a true 'double leverage' caused by the fact that the Parent's ownership of United Telephone's common equity is secured by additional debt not apparent if one confines his examination to that Company's individual balance sheet.

"Looking only at the balance sheet of United Telephone for 1970, we see the following capital structure:

| | | |
|---|---|---|
| Long-Term Debt | $12,413,500 | (53.3%) |
| Common Stock Equity | 11,066,989 | |
| (less write-off) | 193,670 | |
| Adjusted Common Equity | $10,873,319 | (46.7%) |

"However, as above noted, the equity of United Telephone is not secured solely by investor's equity. Instead, it is secured by the capital structure of its Parent, which is as follows:

| | | |
|---|---|---|
| Long-Term Debt | $150,266,500 | (27.03% at 6.171%) |
| Capital Stock | 405,598,304 | (72.97%) |
| Total Capitalization | $555,859,804 | |

"Thus, the apparent common equity, as derived strictly from United Telephone's individual balance sheet, is actually composed of 72.97% actual investor's equity, and 27.03% of its Parent Company's debt.

"When corrected for the additional debt of the Parent, United Telephone's capital structure becomes:

| | | |
|---|---|---|
| Long-Term Debt (United Tel.) | $12,413,500 | (53.31%) |
| Long-Term Debt (Parent) | 2,939,058 | (12.62%) |
| Investor's Common Equity (United Tel.) | 7,934,261 | (34.07%) |
| Total Capitalization | $23,286,819 | 100.00% |

"Accordingly, in terms of actual investor's equity as traded on the stock exchange United Telephone's 8.11% overall earned rate of return for calendar year 1970 results in an 11.715% return on the common equity portion of United Telephone's net investment rate base, computed as follows:

| | % Total | Cost % | Weighted Cost % |
|---|---|---|---|
| Long-Term Debt | 53.31 | 6.270 | 3.34 |
| Long-Term Debt (Parent) | 12.62 | 6.171 | .78 |
| Common Equity | 34.07 | 11.715 | 3.99 |
| Total | 100.00 | | 8.11 " |

The Commission concluded its discussion of the fair rate of return issue with the following comments:

"The above noted infirmities in the Company's cost-of-capital presentation [use of only one of the test years and comparison of realized returns on *book value* of equity investments in allegedly comparable enterprises rather than *market value*], infirmities which are also reflected in the Staff's position on the cost of capital issue, are so basic and pervasive as to justify a conclusion that the Company has failed to sustain its statutory burden of proof on this point and thus, must fail in its rate increase proposal.

"Such a finding could, of course, be dispositive of this case. However, because of the experience gained, through careful ex-

amination of precedent, review of other state commission decisions, and the exercise of our responsibilities as trier of fact in the numerous rate cases tried before us in months past, we are able to make an affirmative finding that the Company's earned returns during the test periods involved were adequate, just and reasonable, in fact, a return on common equity of 11.-715 percent would appear to be relatively high, * * *."

We now deem it advisable to state our understanding of the theory behind and the mathematics of the Commission's adjustment to the Company's capital structure. The Company contends its capital structure consists of $12,413,500 long-term debt and $10,873,319 adjusted common equity. The Commission agrees the Company would be correct in its calculations if the Company were not a wholly owned subsidiary of a holding company.

As stated earlier, the Commission pointed out the Company is a wholly owned subsidiary of a holding company. The Commission determined because of this relationship the Company's capital structure must be reflective of the capital structure of the holding company. If it was not made reflective the Company, a wholly owned subsidiary of a holding company, would earn a higher rate of return, as affected by capital structure, than any company not in such a position.

To accomplish this adjustment the Commission looked first to the capital structure of the holding company. It determined the long-term debt of the holding company was 27.03% of the holding company's total capitalization. It next determined the holding company's stock equity was 72.97% of its total capitalization.

The Commission then took the adjusted common equity of the Company ($10,873,-319) and further adjusted it to reflect the 27.03% and 72.97% of the total capitalization of the holding company. The Commission took 27.03% of the $10,873,319 (equalling $2,939,058) from the adjusted common equity and added it to the Company's long-term debt. The remaining $7,934,261 of the $10,-873,319 (equalling 72.97% of the $10,873,319)

constituted the Company's new adjusted common equity (labeled Investor's Common Equity by the Commission).

The $2,939,058 adjustment or addition to the Company's long-term debt, in the Commission's view, reflected the relationship of the Company's capital structure to that of the holding company. In this manner the Commission accomplished its goal of equalizing the rate of return, as affected by capital structure, of a wholly owned subsidiary of a holding company with that of a company not in such a position. The $2,939,058 adjustment was the result of the Commission's application of the double leverage concept to the capital structure of the Company.

The Company argues the Commission's double leverage adjustment in the Company's capital structure was unsupported by substantial evidence of record as required by section 490A.17. Specifically, the Company points to the fact the only evidence pertaining to that theory was introduced by Commissioner Van Nostrand when he questioned a Staff witness. The Company contends such evidence only represents Van Nostrand's theory of double leverage and does not constitute a "solid foundation of fact" upon which the adjustment may be predicated.

■ Chairman Van Nostrand's interrogation of the Staff witness, which elicited the basics of the double leverage theory as applied by the Commission and demonstrated the Commission's intention to at least consider such an adjustment in the Company's capital structure, in conjunction with the evidence of record establishing the capital structure of the Company and its parent, satisfies the substantial evidence requirement of section 490A.17. The complexities inherent in a rate of return determination necessarily require that the Commission be granted considerable discretion. That grant of discretion is a result of the recognition given to the Commission's expertise in the area and is only limited by the four factors enumerated in section 490A.17. The Commission's adjustment to the Company's capital structure based upon double lever-

age is not unsupported by substantial evidence of record.

In this connection, the court in *Central Illinois Public Serv. Com'n v. Federal Power Com'n,* 338 F.2d 682, 685 (7 Cir. 1964), said:

"We hold the Commission is not required to depend on conclusions of expert witnesses in deciding technical matters within the Commission's area of expertise, and may make such determinations from the evidence in the record. \* \* \* [citing authorities]." See also *Trans World Airlines, Inc. v. C.A.B.,* 128 U.S.App.D.C., 126, 385 F.2d 648, 658, cert. den., 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133; *State ex rel. Utilities Com'n v. Virginia E. & Power Co.,* 285 N.C. 398, 206 S.E.2d 283, 296; *Intermountain Gas Co. v. Idaho Public Utilities Com'n,* 97 Idaho 113, 540 P.2d 775, 788.

The Company also challenges the method used by the Commission in applying the double leverage theory. In effect, the Company argues that assuming the application of said theory was appropriate herein, the Commission applied it defectively and in a manner which is unsupported by the record. Pertinent hereto is the following language from *Goodman v. Public Service Com'n of District of Columbia,* 162 U.S.App. D.C. 74, 497 F.2d 661, 665–666:

"\* \* \* It is our duty to examine the Commission's Order to see if it is supported by substantial evidence in the record. This court is not to substitute its view for that of the Commission, even if the Commission chooses between one of two or more permissible but conflicting alternatives. \* \* \* [citing authority]. It is especially important to accord great respect to the Commission in a complex, esoteric area such as rate making in which the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies. Our determination must focus on whether the result reached is arbitrary and appellant bears the burden of clearly demonstrating arbitrary action. He cannot meet this burden by advancing alternative techniques from which the Commission could have chosen. \* \* \* [citing author-

ities]." See also *Nevada Power Co. v. Public Service Com'n,* 91 Nev. 816, 544 P.2d 428, 435–436.

With respect to the deference due the decision of a regulatory agency, the court in *Village of Apple River v. Illinois Commerce Com'n,* 18 Ill.2d 518, 165 N.E.2d 329, 331–332, said:

"On review, the circuit court has neither the power nor the duty to conduct a *de novo* hearing, nor does this court, and the wisdom of the decision of the Commission is not open to inquiry. Indeed, it has long been established that in matters relating to services and rates of utilities technical data and expert opinion, as well as complex technological and scientific data, make it essential that the matter be considered by a tribunal that is itself capable of passing upon complex data. \* \* \* [citing authority]." See also *Iowa-Illinois Gas & Elec. Co. v. Illinois Commerce Com'n,* 19 Ill.2d 436, 167 N.E.2d 414, 417; *Villages of Milford v. Illinois Commerce Commission,* 20 Ill.2d 556, 170 N.E.2d 576, 579; *United Gas Pipe Line Co. v. Louisiana Public Serv. Com'n,* 241 La. 687, 130 So.2d 652, 657; *Almeida Bus Lines, Inc. v. Department of Public Util.,* 348 Mass. 331, 203 N.E.2d 556, 563; *Northwestern Bell Telephone Company v. State,* 299 Minn. 1, 216 N.W.2d 841, 857.

We have been concerned to this point with both the appropriateness of the use of the double leverage theory and with its proper application to the facts in the record. We earlier held the Commission's use of the theory was appropriate. In our review of the Commission's exercise of its expertise and authority we are guided somewhat by the previously cited authorities and, more importantly, by section 490A.17, The Code. After due consideration of both, we find there is substantial evidence in view of the record submitted that the Commission properly applied the theory to the facts in the record. We find no evidence the Commission's application of the theory to these facts was done in an arbitrary and capricious manner.

The Company next contends the Commission should have considered the following factors:

(1) whether the cost of money and capital costs to the Company would, in the future, be increased by the higher risk to investors brought about by the adjustment to its capital structure which resulted in a higher proportion of debt,

(2) whether the parent company's debt-equity ratio was affected by the parent's investment in subsidiaries other than the Company,

(3) whether other loans to the Company should also have been double leverage adjusted,

(4) whether the parent incurs any cost of operations other than cost of capital.

The Company contends the Commission should have considered these factors, not in evidence, in its double leverage capital adjustment because these factors would change the debt-equity ratio of the parent. Since the Company's capital structure was made reflective of that of its parent, the Company argues changes in the parent's capital structure would result in changes in the adjustment of the Company's capital structure and, therefore, should have been considered.

While we express no opinion as to whether these factors would affect the parent's debt-equity ratio, we find the Company's contention to be without merit. As noted earlier, it is the Company which bears the burden to prove its rate increase was reasonable. If the Company felt these factors were important, it should have presented proof as to them. It did not present such proof; therefore, the Company failed to meet its burden.

The Company's final contention in this division is that the Commission's application of the double leverage theory constitutes a violation of the constitutional mandate of equal protection of the law. Specifically, the Company contends the Commission only applies the double leverage theory to utilities wholly owned by a holding company, relying upon a Commission statement to that effect *In Re Iowa Teleph. Co.*, 95 P.U. R.3d 221, 242 (Iowa 1972).

The Commission, on the other hand, maintains the requirements of equal protection necessitate a double leverage adjustment when a holding company is involved in order to insure that utilities not so held are treated equally with respect to a rate of return determination.

The Commission's position is well founded and is dispositive of the Company's contention. The existence of a holding company relationship, as here, produces a situation where the subsidiary's capital structure is not truly reflective of the actual debt-equity ratio therein. A double leverage adjustment is an attempt to more accurately present the capital structure of the subsidiary utility and, consequently, an attempt to insure a *fair* rate of return determination. As pointed out by the Commission, the Company's argument flies in the face of the very purpose of such an adjustment. Clearly, the Company's position is without merit and cannot be sustained.

VII. The Company challenges the jurisdiction of this court to grant the Commission's request for an increase, after date of appeal to this court, of the interest rate as fixed by the Commission in its May 1, 1972, order.

The Commission's order dated May 1, 1972, contained the following language with reference to the refund necessitated thereby:

"United Telephone Company of Iowa shall submit within thirty days after the issuance of this order, a plan by which refunds shall be made to customers of all sums, in excess of those authorized therein, together with 5% interest thereon and the sales tax accruing from such collections. Upon approval by the Commission of the refund plan, United Telephone Company of Iowa, shall forthwith make refunds in accordance with such plan."

The Company's notice of appeal to this court was filed February 6, 1974. There was no cross appeal by the Commission. February 15 the Company filed a motion

with this court seeking a stay of the Commission's order pending final disposition of this appeal. February 27 the Commission filed a "Statement of Position" with this court which stated in part:

"Defendant-Appellee has no objection to the Court's granting Plaintiff-Appellant's request for an order staying the Commission's Order * * * pending this appeal and pending further order of this Court, conditioned upon the undertaking proposed by Plaintiff-Appellant in its Motion, as long as the Court further conditions the order upon Plaintiff-Appellant's agreement to pay interest at nine percent per annum from the date of appeal to this Court, February 6, 1974, on any refunds which may become due and payable under the terms of the decree finally entered."

The Commission asserted the following considerations in support of its requested increase in interest:

"a. On May 1, 1972, when the Commission issued its Decision and Order * * *, the prime interest rate on short-term debt was five percent.

"b. On December 22, 1972, when the Commission entered into a Stipulation * * * agreeing to a stay order * * *, the prime interest rate on short-term debt was approximately six percent.

"c. The prime interest rate on short-term debt as of February 20, 1974, was nine percent.

"d. The present appeal * * * will not be finally determined for a period of twelve to eighteen months.

"e. The economic conditions today are such that to allow * * * rate increase subject to refund at five percent interest, is grossly unfair and inequitable to the ratepayer.

"f. The equitable relief being requested by * * * [the Company] is inexplicably related to the ratepayer's right to a fair and just interest payment on any amounts of rates * * * finally determined to be unreasonable and unjust."

On February 27 this court granted the Company's request for a stay of the Commission's order. They stay order included the following language:

"IT IS FURTHER ORDERED that the court reserves until adjudication of the merits of the appeal determination, without prejudice to the position of either party if refunds are ultimately ordered, what rate of interest will be owed thereon including the period during which this stay is effective."

The Commission relies to some extent upon section 490A.6, The Code, in urging this court to establish an interest rate of no less than nine percent on any rates or charges collected by the Company from February 6, 1974 (the date of the Company's appeal to this court) which sums are in excess of those authorized by the revised tariff which the Commission ordered the Company to submit for approval.

Section 490A.6 was amended by the Second Session of the Sixty-fourth General Assembly, chapter 1101, effective July 1, 1972, by adding to the sixth unnumbered paragraph thereof the following: *"The commission shall* establish a rate of interest to be paid by a public utility to persons receiving refunds. Such rate of interest shall be not less than five percent per annum, nor more than nine percent per annum." (Emphasis supplied).

The Company argues its appeal to the Jasper District Court on May 24, 1972, removed the proceeding from the jurisdiction of the Commission. Consequently, on July 1, 1972, when the Commission first became invested with the power to fix interest within a range of five to nine percent the Commission no longer had jurisdiction over the case. It must be conceded this contention has merit.

The Company then maintains courts are without power to fix rates of interest to be paid by public utilities to persons receiving refunds by reason of an order of the Commission in a rate-fixing proceeding since such authority is invested exclusively in the Commission by the emphasized portion of section 490A.6.

The Commission, on the other hand, maintains that where there is an appeal from an order of the Commission in a rate-fixing proceeding the supreme court has jurisdiction by virtue of section 490A.18 to fix the rate of interest on refunds due persons by reason of the utility's continued collection after date of appeal to this court of rates and charges for services furnished by the utility in excess of those authorized by the approved revised tariff.

Section 490A.18 provided as follows:

"During the pendency of an appeal the district court or supreme court may grant affirmative relief in whole or in part under bond or other undertaking and pending appeal *on such terms as the court deems just,* and in accordance with the practice of courts administering equity jurisprudence." (Emphasis supplied).

In response to the Commission's contention in the foregoing respects the Company insists the last sentence of section 490A.6, being specific, governs the present case rather than section 490A.18 which is general.

The last sentence of section 490A.6 provides: "In the event a petition for rehearing is filed or an appeal is taken from an order concerning rates, charges, schedules or regulations which are in effect under bond, those rates, charges, schedules or regulations may be continued in effect by the utility under the terms of a bond or other undertaking pending final determination of the application for rehearing or appeal from an order of the commission."

The effectiveness of the Company's argument in the foregoing respect depends on this court's determination whether (1) sections 490A.6 and 490A.18 are irreconcilable, section 4.8, The Code, or (2) the legislature intended by its 1972 amendment to section 490A.6 to invest the commission with exclusive authority to fix the rate of interest to be paid on refunds due as a result of a rate-fixing proceeding. We deem both adversely to the Company.

As to the first, it is our view section 490A.6 concerns the commission in its rate-fixing authority whereas section 490A.18 deals with review by the courts of the commission's exercise of that authority. In our opinion section 490A.6 complements section 490A.18; the statutes are reconcilable. As to the second, if we were to adopt the Company's contention as to lack of jurisdiction of the courts, we would be required to hold review of the actions of the commission by courts is proscribed in all instances where the legislature employed the phrase "the commission shall." We decline to so construe the statute.

We are convinced under the circumstances disclosed by the record in this case the question as to the rate of interest to be paid by the utility to persons entitled to refunds is a proper issue for determination by this court.

The Company is therefore ordered to pay interest at the rate of nine percent per annum on all amounts due and owing to ratepayers as refunds for rates and charges collected starting February 6, 1974, and subsequent thereto, which are in excess of those authorized by the approved revised tariff. Such refund payments shall commence in accordance with the May 1, 1972, order of the Commission.

In all other respects the order of the Commission is affirmed. The trial court was correct in its ruling.

In reaching our determination in this matter we have considered every contention urged or asserted by the Company on its appeal whether specifically referred to or not and find none which would justify a different conclusion.

The case is therefore—Affirmed as modified.