NORTHWESTERN BELL TELEPHONE
COMPANY, Appellee,

v.

IOWA STATE COMMERCE
COMMISSION, Appellant,

Meredith Corporation, United States De-
partment of Defense, and Answer
Iowa, Inc., Intervenors.

No. 83–1503.

Supreme Court of Iowa.

Dec. 19, 1984.

Philip E. Stoffregen, Gen. Counsel, Patrick J. Nugent, Deputy Counsel, and William A. Haas, Asst. Gen. Counsel, Des Moines, for appellant.

Donald H. Sitz and David A. Dettmann of Lane & Waterman, Davenport, and W.K. Schaphorst and Robert H. Jackson, Des Moines, for appellee.

UHLENHOPP, Justice.

This appeal involves issues which arose in a proceeding to set intrastate rates of Northwestern Bell Telephone Company (Bell) for a period prior to divestiture of Bell by American Telephone and Telegraph Company (AT & T). During that period Bell was a subsidiary corporation of AT & T. We first briefly describe the statutory regulatory scheme. The applicable statutes are those in the Iowa Code of 1983; our citations are to that Code unless otherwise stated.

A public utility, including a corporation furnishing communications services to the public for compensation, § 476.1(2), is required to file tariffs with the Iowa State Commerce Commission showing rates and charges. § 476.4. A utility can change its rates only by filing new rates with the commission at least thirty days prior to their effective date, § 476.6(1), together with factual evidence, written argument, and affidavits containing testimonial evidence. § 476.6(7). The commission may initiate formal proceedings regarding the new rates, and this automatically suspends them. § 476.6(8).

Formerly the statute provided that when the new rates had been suspended for ninety days the utility could place them in effect under bond pending the commission's final decision on the rates. Iowa Code § 476.6 (1979). The result was what the commission calls "pancaking," whereby new rate changes were filed on top of each other resulting in continued collection of rates unapproved by the commission.

The General Assembly dealt with the problem of temporary rates by changing section 476.6(13) to read as follows in the 1983 Code, effective July 1, 1981:

Upon the request of a public utility, the commission shall, when required by this paragraph, grant the public utility temporary authority to place in effect any or all of the suspended rates, charges, schedules or regulations by filing with the commission a bond or other undertaking approved by the commission conditioned upon the refund in a manner to be prescribed by the commission of any amounts collected in excess of the amounts which would have been collected under rates, charges, schedules or regulations finally approved by the commission. In determining that portion of the new or changed rates, charges, schedules or regulations to be placed in effect prior to a final decision, the commission shall apply previously established regulatory principles and shall, at a minimum, permit rates and charges which will allow the utility the opportunity to earn a return on common stock equity equal to that which the commission held reasonable and just in the most recent rate case involving the same utility or the same type of utility service,

provided that if the most recent final decision of the commission in an applicable rate case was rendered more than twelve months prior to the date of filing of the request for temporary rates, the commission shall in addition consider financial market data that is filed or that is otherwise available to the commission and shall adjust the rate of return on common stock equity that was approved in that decision upward or downward as necessary to reflect current conditions. The commission shall render a decision on a request for temporary authority within ninety days after the date of filing of the request. The decision shall be effective immediately. If the commission has not rendered a final decision with respect to suspended rates, charges, schedules or regulations upon the expiration of ten months after the filing date, plus the length of any delay that necessarily results either from the failure of the public utility to exercise due diligence in connection with the proceedings or from intervening judicial proceedings, plus the length of any extension permitted by section 476.33, subsection 3 [additional time for good cause shown], then those portions that were approved by the commission on a temporary basis shall be deemed finally approved by the commission and the utility may place them into effect on a permanent basis, and the utility also may place into effect subject to refund and until the final decision of the commission any portion of the suspended rates, charges, schedules or regulations not previously approved on a temporary basis by filing with the commission a bond or other undertaking approved by the commission.... The commission shall establish a rate of interest to be paid by a public utility to persons receiving refunds. The rate of interest shall be a reasonable rate as determined by the commission, but not less than five percent per annum, and the interest shall be compounded annually. The public utility shall not place into effect any portion of any suspended rates, charges, schedules or regulations of any subsequent rate filing relating to services with respect to which a rate filing is pending within twelve months following the date a prior application was filed or until after the date the commission has issued a final order in any previously filed rate proceedings, whichever date is earlier, unless the public utility applies to the commission for authority and receives authority to place a portion of the subsequent rate filing into effect on an interim basis.

As to permanent rates, section 476.6(10) provides in substance that if the commission after hearing decides that the proposed rates are unlawful, the utility shall file permanent rates in accordance with the decision of the commission. If the utility then petitions for judicial review of the commission's decision on permanent rates, it may continue, during the pendency of judicial review, to collect under bond the temporary rates it has been collecting.

On September 2, 1981, Bell filed a request, with supporting material, to increase rates to produce additional annual revenue of $28.5 million. The commission ordered formal proceedings on the request, which suspended the new rates. On November 30, 1981, the commission ordered a temporary increase of $18.891 million. Bell asked for a rehearing. After oral argument, the commission denied a rehearing on January 7, 1982.

On January 27, 1982, Bell filed in district court a petition for judicial review of the temporary rates and for an order staying the commission's order and increasing the temporary rates to $25.495 million. The same day the district court, ex parte, granted the stay, placed in effect the temporary rates requested by Bell, and ordered Bell to give notice of the order to the commission's counsel within ten days. Various proceedings then occurred which are not now material.

The commission proceeded with the original request for permanent rates, set and held hearings and meetings, and by orders on June 25 and August 4, 1982, granted Bell's permanent rate increase in part and

denied it in part. The commission's decision on permanent rates called for a revenue increase of $10.6 million, in contrast to the temporary rate increases in revenue of $18.891 million by the commission and $25.496 million by the district court. Bell then filed a petition for judicial review of the commission's order on permanent rates.

The district court combined the two petitions for judicial review, held a hearing, and on September 21 and October 25, 1983, rendered decisions on the two petitions, upholding the commission's temporary and permanent rate orders in part and reversing them in part and returning the proceedings to the commission.

The commission appealed to this court and Bell cross appealed. We consolidated the two proceedings. As the proceedings are under chapter 17A of the Code, "the district court, when exercising the power of judicial review conferred by section 17A.19(8), functions in an appellate capacity to correct errors of law on the part of the agency.... In our review of such action by the district court we merely apply the standards of section 17A.19(8) to the agency action to determine whether our conclusions are the same as those of the district court." *Lefebure Corp. v. Iowa Department of Job Service*, 341 N.W.2d 768, 770 (Iowa 1983).

I. *Temporary rates—authority of district court.* The first issue for consideration relates to the authority of the district court to conduct judicial review of temporary rates ordered by the commission.

The commission argues that under the statute as revised in the 1983 Code, the district court does not have jurisdiction over temporary rates. The commission's position is that the General Assembly prescribed a unified procedure in order to end pancaking and double rate proceedings, temporary and permanent. The utility must initially file its evidence and arguments, and the commission has ninety days from the filing date to rule on temporary rates and ten months from the filing date to rule on permanent rates. The commission contends that the utility may then seek judicial review of the permanent rates. Urging as a general proposition that intermediate judicial review is not permitted, the commission cites *Richards v. Iowa State Commerce Comm'n*, 270 N.W.2d 616 (Iowa 1978).

On the other hand, Bell argues that when the commission sets temporary rates the utility may have judicial review. Its principal factual argument is that if the commission's temporary rates are too low and the utility cannot obtain judicial relief from them, the utility will have no way of recouping its losses for the period the ratepayers pay the deficient temporary rates. It contends that subsequent judicial review of permanent rates is thus an inadequate remedy and, in addition, that ratepayers are not hurt by higher judicially-set interim rates as they are protected by bond.

The judicial review rules are found in chapter 17A of the Code, and particularly in these sentences in section 17A.19(1):

A person or party who has exhausted all adequate administrative remedies and who is aggrieved or adversely affected by any final agency action is entitled to judicial review thereof under this chapter. *When agency action is pursuant to rate regulatory powers over public utilities or common carriers and the aggrievement or adverse effect is to the rates or charges of a public utility or common carrier, the agency action shall not be final until all agency remedies have been exhausted and a decision prescribing rates which satisfy the requirements of those provisions of the Code has been rendered. A preliminary, procedural or intermediate agency action is immediately reviewable if all adequate administrative remedies have been exhausted and review of the final agency action would not provide an adequate remedy.*

(Emphasis added.) The commission asserts the first emphasized sentence controls; that sentence deals specifically with utility rates. Bell asserts the second emphasized sentence controls.

■ We conclude for two distinct reasons that the General Assembly intended utilities should not have judicial review of temporary rates. One reason is that in the 1983 Code the Assembly telescoped the temporary and permanent rate steps into one procedure, evidently to end the prior problem of a utility's placing its new rates in effect in temporary form under bond and then having little motivation to press forward with the permanent rate aspect. The General Assembly has ended the ability of the utility itself to set the temporary rates in the usual situation; the commission sets them and then proceeds to the permanent rates. If instead the utility could obtain judicial review of temporary rates and obtain its desired rates from the courts, as in this case, its motivation to seek permanent rates would be dulled and fulfillment of the legislative scheme would be hampered. To minimize the possibility of harm to utilities, the General Assembly started time running from the original filing, as to both temporary and permanent rates. In the ordinary case, within three months from that filing the commission must set temporary rates and within ten months from that filing it must set permanent rates.

The other reason for our conclusion is that, in the framework of the 1983 Code which we have just described, we think Bell has not demonstrated inadequacy of remedy to the necessary extent. While permanent rates may ultimately be set higher than the commission's temporary rates, by shortening the time for the commission's final decision to ten months and by streamlining the temporary and permanent rate procedure, the Assembly has demonstrated its desire to minimize utility hardship.

■ We have held in another setting that the company has the burden of showing inadequacy of remedy. *Salsbury Laboratories v. IDEQ*, 276 N.W.2d 830, 837 (Iowa 1979). We there quoted B. Mezines, J. Stein & J. Guff, *Administrative Law* § 49.02, at 49–23 (1978):

Under most circumstances, monetary losses caused by litigation expenses or deprivation of earnings are insufficient to be considered irreparable injury....

*Cf. FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 152, 83 S.Ct. 211, 215, 9 L.Ed.2d 199, 205 (1962) ("the company can never recoup the income lost when the five-month suspension power of the Commission is exercised under § 4(e)"). We hold that Bell has not demonstrated inadequacy of remedy, and that judicial review of temporary rates was not available to it. This holding means that the substantive issues concerning temporary rates need not be considered. Bell has collected the temporary rates set by the district court. As a result of this appeal, however, permanent rates will be determined which should have been collected during the temporary period. As those permanent rates will be lower than the temporary rates collected, refunds will be in order for the temporary period.

II. *Permanent rates.* After the commission determined various issues in its final decision relative to permanent rates, Bell petitioned for judicial review as it had an unquestioned right to do. After hearing, the district court decided the issues raised by the parties. In the present appeal the parties argue several of those issues.

A. *Hypothetical capital structure.* Ordinarily, equity capital in a utility's capital structure is more costly to ratepayers than debt in the structure. A utility's income taxes are an expense for rate-making purposes, and interest on debt is deductible by the utility for income tax purposes while dividends on stock are not. In addition, returns on stock are usually higher than interest on bonds, as stock constitutes the risk capital and dividends are not a debt and are behind interest in payment by the utility. A utility must of course have equity capital, and the problem in rate proceedings relates to the proper proportion of equity to debt.

■ 1. The commission's obligation is to set "reasonable and just" rates, under section 476.8 of the Code:

The charge made by any public utility for any ... communications service ...

shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful.

Under similar provisions, courts have held that ratepayers can only be charged rates based upon a reasonable capital structure; for rate purposes, a utility cannot employ a structure which is rich in equity capital when it could provide the service with a higher leveraged structure, that is, a higher proportion of debt to equity. As stated in *COMSAT Corp. v. FCC,* 611 F.2d 883, 904 (D.C.Cir.1977):

> The practice of imputing a hypothetical amount of debt has been explicitly approved by the public utility commissions or courts of at least twenty-two states and the District of Columbia.

Precedent exists in Iowa for use of a hypothetical debt-equity mix. *West Iowa Telephone Co.,* 18 P.U.R. 4th 277, 286 (ISCC 1977); *Davenport Water Co.,* Docket No. RPU–76–3 (ISCC Nov. 21, 1977).

■ Bell argues that a utility should be allowed to select its own capital structure. We have no disagreement with that argument in the abstract. As stated in *COMSAT,* however, when the utility is asking higher rates, a commission may validly inquire whether the utility's capital structure is efficient from the ratepayers' standpoint and, for rate purposes, may employ a hypothetical construct which is in fact more efficient. *COMSAT,* 611 F.2d at 903.

■ Bell also argues that in any event, the commission can only employ a hypothetical capital structure if it shows that the structure it employs is reasonable. Here, however, Bell has the shoe on the wrong foot. As stated in *Union Electric Co. v. FERC,* 668 F.2d 389, 393 (8th Cir. 1981):

> Finally, as we apply the "just and reasonable" standard of review, we must remember that the burden of proof is on the challenger to a Commission order. The FERC's order is the product of expert judgment which carries a presumption of validity. Furthermore, the Supreme Court has said that the burden is

a heavy one: "[H]e who would upset the rate order under the Act carries the heavy burden of making a *convincing showing* that it is invalid because it is unjust and unreasonable in its consequences." [*Federal Power Commission v. Hope Natural Gas,* 320 U.S. [591] at 602, 64 S.Ct. [281] at 287 [88 L.Ed. 333 (1944)] (emphasis added). Therefore, if the challenger fails to produce evidence that a rate is not just and reasonable, the Commission should be affirmed even if it produces no evidence of justness or reasonableness.

*See* Iowa Code § 476.8 ("The burden of proof shall be on the public utility to prove that no unreasonable profit is made."); *United Telephone Co. of Iowa v. ISCC,* 257 N.W.2d 466, 469 (Iowa 1977). If for example the commission's hypothetical structure is such that financial markets would not accept the utility's securities at reasonable rates of return, the utility can show that fact by expert testimony, but Bell did not demonstrate that the commission's hypothesized structure is unreasonable.

The commission also held in this connection that Bell's intrastate operation did not require as high an equity capital proportion as AT & T's interstate operation. Here again Bell did not demonstrate error in the commission's position; on the contrary, the record contains affirmative testimony supporting the commission's holding. In addition, we are in an area of commission expertise to which the courts defer.

■ The district court upheld the commission's hypothesized capital structure, and did not err.

2. The hypothetical amount of Bell's interest deduction for income tax purposes is an offshoot of the hypothetical capital structure employed. Bell states in its brief:

> Under the methodology used by the Commission the amount of test year interest to be attributed to the Company on account of its Iowa intrastate operations depends upon its capital structure.

The Commission chose to attribute to the Company the income tax effects of the more highly leveraged capital structure hypothesized by it. The Company has chosen not to appeal this interest assignment by the Commission, except so far as the Court may determine that the Commission's determination of hypothetical capital structure was in error.

■ As we do not find that use of the commission's hypothetical structure was erroneous, an adjustment in the commission's deduction for interest is not called for. The district court held otherwise and erred in doing so.

B. *Employee adjustment.* The record demonstrates that a decline in the number of employees will occur, and the commission made such an adjustment. Bell contends and the district court held that under the "matching" principle the commission had to make a corresponding adjustment for a resulting increase in other expenses, for example, for automated equipment. We stated an aspect of the matching principle as follows in *Davenport Water Co.*, 190 N.W.2d 583, at 605 (Iowa 1971):

> It is fundamental to a proper test year that costs (both investment and operating) and revenues match, i.e., that they be consistent with each other. Unless there is a matching of costs and revenues, the test year is not a proper one for fixing just and reasonable rates. The inclusion of costs without matching revenues will produce excessive rates. The inclusion of revenues, without the matching costs will deny the utility reasonable rates. The relationship between cost and revenues for the test period used and the validity of that relationship constitutes one of the most vital areas in the determination of just and reasonable rates.

■ Before the matching principle comes into play, however, a resulting increase in expenses must be shown. Section 476.33(4) of the Code, which codifies the principle, provides:

> The commission shall adopt rules that require the commission, in rate regulatory proceedings under sections 476.3 and 476.6, to consider the use of the most current test period possible in determining reasonable and just rates, subject only to the availability of existing and verifiable data respecting costs and revenues, and in addition to consider verifiable data that exists as of the date of commencement of the proceedings respecting known and measurable changes in costs not associated with a different level of revenue, and known and measurable revenues not associated with a different level of costs, that are to occur at any time within twelve months after the date of commencement of the proceedings. For purposes of this subsection, a proceeding commences under section 476.6 upon the filing date of new or changed rates, charges, schedules or regulations. This subsection does not limit the authority of the commission to consider other evidence in proceedings under sections 476.3 and 476.6.

Under this section "verifiable" data and "known and measurable" costs and revenues must appear. Again Bell confronts its burden of showing the fallacy in the commission's decision, but under the record as made Bell's claim of increased other costs rests only on speculation. A projected decline in employees appears; a projected increase in costs may or may not occur but is not established. The district court erred in holding otherwise on this issue.

■ C. *Employee separation expense.* The commission disallowed certain employee separation expenses. Bell does not contest disallowance of the expense but contends that the commission deducted it twice. We are not persuaded that this issue presents a law question; we hold that it presents a fact issue, and the burden is on Bell. We have examined the record as a whole and hold that the commission's decision has substantial evidentiary support. Iowa Code § 17A.19(8)(f). The commission's finding on this point is implicit, under the doctrine of *Iowa Citizen/Labor Energy Coalition, Inc. v. ISCC*, 335 N.W.2d 178, 181 (Iowa 1983). The district court erred in its holding to the contrary.

D. Lead-Lag study. Utilities must of course maintain cash working capital for use in operations. A question exists as to who supplied that capital in Bell's operations, the investors or the ratepayers. To answer such questions, "lead-lag" studies are conducted. If a positive value results, the investors are supplying working capital, while a negative value shows that the ratepayers are supplying working capital. Lead-lag studies by both commission staff and Bell disclosed a negative value. The commission thus made an adjustment in working capital in the rate base. Bell agrees but contends it is entitled to include in the rate base its average actual working capital, because working capital is required in order to operate.

The commission's position is that Bell's inclusion of average working capital would undo the result of the lead-lag study. Witness Maginnis testified:

> The Company has utilized a lead-lag study in calculating the other components of working capital; this methodology measures the funds necessary to pay operating expenses and taxes prior to the collection of revenues applicable to the same accounting period. The funds calculated using the lead-methodology are included in the rate base; to include an additional amount for average cash and working funds would represent a "double dip", that is, the allowance of a return on the same funds calculated by using average book balances rather than the lead-lag study methodology.

 We believe that this issue involved regulatory expertise which is confided to the commission. *United Telephone Co.*, 257 N.W.2d at 466; *Davenport Water Co.*, 190 N.W.2d at 591. Bell has not demonstrated arbitrary, unreasonable, or capricious action by the commission, or an abuse of discretion. Iowa Code § 17A.19(8)(g). The district court erred in its holding on this issue.

 E. Accrued interest. Bell collects money from its ratepayers in part to pay interest on its debt obligations. That money itself accrues interest before it is disbursed to pay interest. The average balance of the accrued interest is available for Bell to use as capital, although it was generated on the money paid by the ratepayers. The commission has a long-standing policy prohibiting shareholders from earning a return on capital contributed by ratepayers.

Witness Maginnis testified:

> [Exhibit 126] ... contains an adjustment to reflect the average test year balance of accrued interest applicable to Iowa. Prior to the time when these amounts are actually paid to investors, they represent a source of cost-free capital to the company, and should therefore be deducted from rate base, as an alternative to adjusting the cost of capital calculation.

The commission deducted the average balance of accrued interest from the rate base, and the district court affirmed that action. We hold that this issue again presents a subject of commission expertise. We perceive no unreasonable, arbitrary, or capricious action. The district court did not err in upholding the commission's position.

We have considered the parties' other arguments in the appeal, but those arguments do not change the result and need not be addressed.

III. *Refunds.* The conclusions we have reached, with the commission's unappealed conclusions, will result in refunds. Two problems exist: the amount of refunds and the manner of payment of them.

 As to amount, we direct the commission to compute the amount of Bell's revenue under the temporary rates for the period they were in effect, and also the amount of revenue which would have been collected for that period if rates had been in force under the principles approved in this opinion and the commission's unappealed principles. The difference between the two amounts of revenue is to be refunded to the ratepayers with interest.

As to the manner of refunding, section 476.6(9) provides for collection of temporary rates "conditioned upon the refund *in a manner to be prescribed by the commission* of any amounts collected in excess of the amounts which would have been collected under rates, charges, schedules' or regulations finally approved by the commission." (Emphasis added.) Bell contends that refunds should be made "across the board," while the commission desires to have refunds made on a rate-by-rate or schedule-by-schedule basis. The commission makes a persuasive argument that its mode of refunding will likely return the money to ratepayers in closer proportion to the amounts paid by them. In addition, this authority is expressly committed to the commission by the quoted statute. We perceive no abuse of discretion in the commission's refunding preference, and approve it. The district court erred in holding otherwise.

We remand the case to the commission for final proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All Justices concur except REYNOLDSON, C.J., and McCORMICK and SCHULTZ, JJ., who take no part.