BOARD OF DENTAL EXAMINERS, Appellant,

v.

Ronald Bob HUFFORD, Appellee.

No. 89–1200.

Supreme Court of Iowa.

Sept. 19, 1990.

Thomas J. Miller, Atty. Gen., and Theresa O'Connell Weeg, Asst. Atty. Gen., for appellant.

David S. Wiggins and Edward N. McConnell of Marcucci, Wiggins, & Anderson for appellee.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, NEUMAN, and SNELL, JJ.

SNELL, Justice.

This case concerns the suspension of the license to practice dentistry of Ronald Bob Hufford, a practicing dentist in West Des Moines, Iowa, since 1954. The board of dental examiners filed a formal complaint against Hufford on March 31, 1988, alleging that he violated numerous statutes and rules pertaining to the practice of the profession of dentistry. Specifically, the Board charged that he fraudulently treated a patient suffering from multiple sclerosis (M.S.) by extracting all of her teeth. On hearing, the board suspended Hufford's license to practice dentistry for five years, staying all but the first nine months, subject to the performance of specified conditions.

Hufford appealed the agency's decision to the district court for judicial review. There the agency's decision was vacated, the board being directed to enter an order dismissing the complaint against Hufford. We now reverse that decision and reinstate the decision of the board of dental examiners.

The board of dental examiners is a professional licensing board created by statute and charged with the responsibility of regulating the practice of dentistry in Iowa to insure that the public health, safety, and welfare are protected. *See* Iowa Code chs. 147, 152 & 258A (1987). One of the board's specific duties is to investigate disciplinary complaints and to impose disciplinary sanctions against dentists when warranted.

In the present case a complaint was filed with the board by Gail Thompson. In her complaint Thompson alleged that she sought treatment from Dr. Hufford in order to relieve the symptoms of her M.S. The board made extensive findings of fact as follows.

I. *Board's Findings of Fact.*

The complaint in the present case was filed by Gail Thompson who had suffered from the long-term effects of M.S. Thompson was having no dental problems or pain of dental origin. Her dental needs over the past eight years required an average of less than two fillings per year in addition to teeth cleaning. She had numerous extensive but serviceable fillings and no evidence of severe decay. Her teeth had healthy bone support with only minor gum problems. Thompson indicated to Dr. Hufford that she wished to keep her natural teeth and avoid having to have dentures.

Thompson had been diagnosed as having M.S. at the University of Iowa in 1973 and that diagnosis was confirmed at the University of Minnesota that same year. The M.S. diagnosis was reconfirmed at Fairview Hospital in February 1987. Thompson was concerned that the mercury in her amalgam fillings might be adversely affecting her health and contributing to her M.S. symptoms. She had become aware of this possibility by reading literature and having had contact with persons who were advocates of this hypothesis. She had obtained a referral from the office of one such advocate, Dr. Hal Huggins, D.D.S., of Colorado Springs, Colorado, to Hufford. The patient traveled from Ackley, Iowa, to West Des Moines, Iowa, for her appointment with Hufford.

Thompson had numerous large amalgam fillings. Hufford tested her teeth with a volt meter and informed her that she had several fillings with high negative readings which Hufford led her to believe were bad for her and should be removed. The testimony of two expert witnesses established that electrical currents from teeth have no known diagnostic or therapeutic value, and there is no scientific basis for the use of such an instrument in dental diagnosis.

Hufford determined through what he termed "applied kinesiology" testing that the patient was allergic to certain types of dental filling materials. The testimony of the State's expert witnesses established that the use of "applied kinesiology" for

testing allergic response to dental materials has no scientific basis.

Based on his "applied kinesiology" testing, Hufford determined that he would have to use very expensive restorative materials, i.e., gold crowns, in replacing the patient's amalgam fillings. Hufford gave the patient two treatment options. The first option was a full mouth reconstruction which included sixteen porcelain on gold crowns, two extractions and two three-unit porcelain on gold bridges at a cost of $9252. In the alternative the patient was given the option of a full mouth extraction and full upper and lower dentures at a cost of $3530. Thompson could not afford the cost of the full mouth restoration, and, understanding that she should have her fillings removed, she chose to have her teeth extracted instead. Hufford extracted all of the patient's teeth and placed full upper and lower dentures on April 30, 1987.

Hufford assured patient Thompson that the removal of her amalgams would improve her health and stop the progress of the M.S. Hufford denied that he said this, but the patient's testimony, the wording of the consent prepared by Hufford, Hufford's note to the file, and the correspondence indicate otherwise. In addition, Hufford prescribed substances for the patient which are ostensibly used to remove mercury from the body. These substances were Ex–IT, Eater's Digest and Transmix, which Hufford purchased in bulk from Dr. Hal Higgins of Colorado Springs, Colorado, an advocate of unorthodox procedures in determining mercury toxicity.

A State's witness when visiting the office of Dr. Hufford was invited to observe Hufford using a volt meter. Hufford demonstrated the volt meter on the State's witness and advised that one amalgam filling had a high negative reading and should be removed. This is consistent with the patient's testimony when the patient expressed reservations to Hufford about having her teeth extracted. Hufford replied, "surely you don't want all those negative fillings in your mouth."

Prior to extracting all of her remaining twenty-eight teeth on April 30, 1987, Hufford asked the patient to sign a consent form. At the hearing, Hufford stated that he extracted the patient's teeth for dental reasons only. However, the wording and context of the release itself does not support this. The board carefully considered the credibility of both the patient and Hufford and concluded that the patient's testimony was the most believable and consistent. Hufford offered exhibits and his patient file in support of his contention that he removed the teeth for dental reasons. The file indicates that in Hufford's view the patient had only mild gingivitis. The board seriously questioned Hufford's ability to recall the condition of each of the patient's teeth as detailed in Exhibit M which was prepared three weeks prior to the hearing and more than seventeen months after he last examined her. Moreover, the board found that while a full mouth reconstruction could be justified for dental reasons, full mouth extraction could not.

Except in individuals sensitive to mercury, there is no justification for the removal of serviceable amalgams. An American Dental Association resolution dated December 1, 1986, states that it is unwarranted to advocate the removal of amalgam restorations solely to substitute a material containing no mercury. The effect of such a procedure and further restoration could be detrimental to the patient's oral health and cannot be justified. Individuals suspected of having an allergy to mercury should be referred to qualified medical personnel for suitable testing. If mercury toxicity is suspected blood mercury levels would have to be determined. There has never been a documented case of mercury toxicity secondary to amalgam fillings.

The only possible justification for the treatment provided by Hufford to the patient Thompson is mercury toxicity. Hufford failed to establish mercury toxicity. He made no attempt to refer the patient to qualified medical personnel for suitable testing to determine toxicity or allergy to mercury. Hufford told the patient that blood tests would be an unnecessary expense. In addition, Hufford gave the pa-

tient the names of two of his other patients whose M.S. symptoms allegedly improved after their mercury fillings were removed. Four dentists testified that full mouth extraction was not warranted for the patient. Hufford essentially conceded that full mouth extraction was not necessary for dental reasons because he initially offered her the option of a full mouth reconstruction, which indicates that the teeth and supporting structures were healthy and that no other evidence was presented to justify extraction. A peer review committee consisting of three dentists concluded that additional alternative treatment plans should have been considered.

Hufford never told the patient that the vast majority of the evidence in the dental literature indicates a lack of support for the theory that mercury from dental fillings affects M.S., nor did he tell her that trauma and infections usually cause an exacerbation of M.S. symptoms. A full mouth extraction is a traumatic procedure, both physically and psychologically. It is the most serious procedure that a dentist can recommend for a patient. A month after having undergone the procedures performed by Hufford the patient Thompson was hospitalized for several days as her M.S. condition worsened.

The National Medical Advisory Board advises that replacement of amalgam fillings cannot be recommended for the treatment of M.S. The board noted that the procedure involves economic implications, in terms of expense to the patient and great profit to the dentist.

The full mouth extraction of Thompson's teeth, without an independent diagnosis of mercury toxicity or other valid diagnostic evidence was well below the standard of care for dentists in the State of Iowa.

## II.  Board's Conclusions of Law.

In its conclusions of law the board held that Hufford violated Iowa Code section 153.34(11) (1987), and 320 Iowa Administrative Code 30.4(16) by his failure to maintain a reasonably-satisfactory standard of competency by improperly diagnosing and planning treatment for a patient claiming to be suffering health complications due to her amalgam fillings. Hufford was also found to have violated Iowa Code section 153.-34(4) (1987) and 320 Iowa Administrative Code 30.4(8) by unnecessarily extracting all of the patient's remaining teeth with no scientific basis for the treatment amounting to willful and gross malpractice in the practice of dentistry. The board further found that Hufford violated Iowa Code sections 258A.10(6) and 153.34(5), (7) (1987), and 320 Iowa Administrative Code 30.4(3), (10), by committing fraud in representations as to skill and ability by words and conduct, false and misleading allegations, and concealment of that which should have been disclosed, by failing to refer Thompson for proper diagnosis of mercury toxicity or allergen sensitivity prior to proposing treatment plans. Finally, the board held that Hufford violated Iowa Code sections 258A.10(3) and 153.34(9) (1987), by misleading the patient into believing that the "allergy tests" he performed were conclusive and further misleading her into believing that the course of her manifestly-incurable disease could be altered or abridged by Hufford's treatment plans.

## III.  Scope of Review.

■ Our scope of review is at law, not de novo, and we are limited to the record made before the agency. *Taylor v. Iowa Dep't of Job Serv.*, 362 N.W.2d 534, 537 (Iowa 1985); *Green v. Iowa Dep't of Job Serv.*, 299 N.W.2d 651, 655 (Iowa 1980). We must determine whether the agency decision is supported by substantial evidence when the record is viewed as a whole. Iowa Code § 17A.19(8)(f) (1987); *Woodbury County v. Iowa Civil Rights Comm'n*, 335 N.W.2d 161, 164 (Iowa 1983). If we find that the agency's findings are supported by substantial evidence, we are bound by those findings.

## IV.  Substantiality of Evidence.

■ This appeal is by the attorney general of Iowa representing the board of dental examiners asserting that the district court made errors of law in its review of the agency's actions. The district court

accepted in part the arguments made by appellee Hufford that errors were made by the agency that necessitated a vacating of its decision. Various brief points of the parties are directed to their not necessarily mutually obverse assertions. However that may be, the gravamen here, in answer to our charge as a reviewing court, is whether substantial evidence supports the agency's decision.

In our review of this record we find considerable evidentiary support for the findings made by the dental board. In addition, we note the expert opinion of Dr. Gilbert E. Lilly, professor, and head of oral pathology and diagnosis at the University of Iowa College of Dentistry. He stated that there is no evidence to suggest that multiple sclerosis is due to mercury toxicity. There have been no documented cases of mercury toxicity due to amalgam restorations. The intraoral galvanic currents that Dr. Hufford recorded in Gail Thompson's case have no meaning in terms of mercury toxicity. They do not measure or predict blood mercury levels. In summary, Dr. Lilly stated that Dr. Hufford had been guilty of gross malpractice in failing to establish a diagnosis of mercury toxicity (which almost certainly was not present) but proceeded to treat the patient for mercury toxicity by extraction of all her teeth. Dr. Lilly further stated that the fact that Gail Thompson wanted the treatment and appeared convinced that her disease was not multiple sclerosis but was due to mercury toxicity caused by amalgam restorations, has no bearing in this case. Health care professionals are responsible for their diagnosis and therapy irrespective of the patient's opinions and desires. Patients can accept or reject the health care professional's diagnosis and therapeutic recommendations, but they are not professionally competent to make the diagnosis and determine treatment.

Also included in the record before the agency is the opinion of Dr. Phillip A. Lainson, professor and head of the Department of Periodontics, University of Iowa College of Dentistry. He said that from the information submitted to him concerning patient Thompson, including x-rays and a panorex radiograph, he found no evidence to support the extraction of any or all of her teeth because of periodontal disease. Furthermore, from the radiographic evidence he found no evidence to support the extraction of any or all of her teeth due to caries or periapical pathosis. Dr. Lainson stated that he was not aware of any scientific evidence in accepted dental-medical literature to support the justification for extracting all of patient Thompson's teeth to rid her body of mercury toxicity in order to improve or cure her multiple sclerosis. He was also not aware of any scientific literature to support the method used by Hufford to measure the mercury toxicity of her amalgam restorations.

Dr. Lainson stated that the records and correspondence made it quite evident that the patient was seeking a possible treatment which would improve or cure her multiple sclerosis. Although the patient sought and consented to the treatment, there was no justification for the treatment provided by Dr. Hufford.

Hufford offered evidence from other witnesses to support his theory of mercury poisoning. Dr. John Belitz believed in but did not perform blood mercury level tests to see if the patient had a mercury toxicity. He performed other tests which the State experts stated had no scientific validity. A Dr. Herman, who had never seen Thompson, testified about the principle of applied kinesiology but said he only used it at parties. Two other dentists testified that they had seen patient Thompson before she went to Hufford. Both said that her dental problems were not so serious that a full mouth extraction, the most extreme dental procedure possible, was warranted. Contrary to his suggestion initially that Thompson replace her old fillings with gold, Hufford testified before the board that he extracted all of her teeth because her decay was so severe that no other alternative was possible. He denied that he diagnosed and treated her for mercury toxicity because he believed such treatment would be "fraud and quackery."

In reviewing all the evidence the board obviously believed the evidence against

Hufford and found his explanations not credible. We also find substantial support for the board's position.

### V. *Ex Parte Communication to Board.*

In seeking to uphold the decision of the district court, Hufford raises other issues. He objected at the board's hearing and before the district court to an ex parte communication made by the assistant attorney general and the secretary of the board. He claims prejudice from this and seeks to disqualify the entire board from hearing the complaint. The argument is made that Iowa Code section 17A.17(3) (1987) is violated as well as the equal protection and due process clauses under the federal and state constitutions.

The communication occurred when the State filed a request to use the testimonial deposition of Thompson who had moved to Arizona. The secretary for the board asked the State's attorney if an order was needed after the board voted to grant the request. The State's attorney answered affirmatively and the order was issued. The entire issue became moot when Thompson returned to Iowa and was available to testify at the hearing.

From this event Hufford complains that the whole process was tainted. He seeks support from our decision in *Blinder, Robinson & Co. v. Goettsch*, 431 N.W.2d 336 (Iowa 1988). In *Blinder* we held the statute violated when the insurance commissioner had previously served as attorney for a securities broker being prosecuted by his department. The statute disqualifies an individual from participating in the decision if he or she had prosecuted or advocated a position for a party previously in the case.

In the instant case there is no similarity to *Blinder*. This simplistic statement to enter an order certainly did not place the assistant attorney general in the dual capacity of advocating for the board and prosecuting the case in violation of the statute. Further, the board's executive director is not a decision maker, but is the board's employee and therefore subject to the board's authority. *See* Iowa Code § 153.33(2) (1987). The State's attorney is an assistant attorney general assigned to prosecute disciplinary cases before the board and exercises no authority, direction or discretion over the board's decision-making process.

The board allowed Hufford to make a record on this point by admitting three exhibits but denied Hufford's demand that he be allowed to question board members. The State objected to the questioning of board members on the ground that the discovery time had passed and that this was nothing more than a fishing expedition. We agree and find that this resolution by the board was appropriate for an insignificant point, in any event rendered irrelevant by Thompson's appearance.

### VI. *Disqualification of Board Members.*

Hufford also claimed a right to question board members concerning his motion to disqualify any board member from hearing his case who participated in the decision to file charges against him. Questioning on this issue was also not permitted.

The accusation here is that the board has unconstitutionally acted as decision maker and prosecutor. We have considered this claim in other contexts and found it wanting. In *Wedergren v. Board of Directors*, 307 N.W.2d 12, 18 (Iowa 1981), we upheld the constitutionality of the school board hearing a case to discharge the superintendent. We found that the presentation of the case there, as here, was done by outside counsel. There is no merit in this issue.

### VII. *Legal Standards.*

#### A. *One Incident.*

Hufford further claims that his license cannot be suspended on the basis of one incident. The argument is that the board erred in finding that Hufford failed to maintain a reasonable standard of competency by considering only one incident, an allegedly-improper legal standard. Sup-

port is sought from a Maine case wherein the statement is made:

"Incompetence" means a lack of the learning or skill necessary to perform, day in and day out, the characteristic tasks of a given calling in at least a reasonably effective way. Competency does not mean perfection, and incompetence is not ordinarily established by the showing merely of an isolated instance in which performance has been inadequate. If, in view of the current state of the art, a dentist's methods and techniques are sound, proof that his performance has been inadequate in rare and isolated incidences during a long professional life should not ordinarily subject him to revocation of his license ... for incompetence or unskillfulness.

*Board of Dental Examiners v. Brown,* 448 A.2d 881, 883 (Me.1982).

We see no reason to object to the reasoning of the Maine court. Neither do we find it applicable to or supportive of Hufford's position. The board found Hufford's methods and techniques were not sound and that his performance was inadequate. Logic does not support the idea that no matter how bad an incident of malpractice may be that the board must await further incompetent acts of dental practice before it can suspend the dentist's license. We reject this notion.

The claim that an improper legal standard was used by the board attacks the board's interpretation of the statutory language "willful and gross malpractice." Various ideas are woven into this argument.

### B. *Willful Malpractice.*

█ Hufford suggests his acts were not willful because he did not intend to injure the patient. The board answered this by quoting our case of *Thompson v. Bohlken,* 312 N.W.2d 501, 504–05 (Iowa 1981):

The usual meaning assigned to "willful," "wanton" or "reckless" according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to or so obvious that he must

be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

Applying this standard the board found that the extraction of all of the patient's teeth based upon inadequate and unscientific "applied kinesiology" and "volt meter" tests certainly meets the definition of willful as stated. The complete inadequacy of these tests as a basis for a diagnosis of mercury toxicity was clearly established by both the testimony and exhibits. Hufford's diagnosis and treatment were far below the standard of care for dentists in Iowa. Given the severe consequences to Thompson as a result of the unwarranted treatment plan of Hufford, the malpractice in this case was appropriately characterized as "gross malpractice." We agree with the board's characterization.

### C. *Gross Malpractice.*

█ Next it is urged that the board erred in considering the severity of the consequences to the patient in determining Hufford had committed "gross malpractice." It is claimed that gross malpractice is no different from "gross negligence" in definitional concept. Without passing on these suggested similarities, we are satisfied the board may properly consider the effect on a patient who is the object of a dentist's acts of malpractice.

### D. *Right of Privacy.*

█ Hufford further claims and the district court agreed that as a matter of law he could not be guilty of malpractice because the patient has a right of privacy to obtain unconventional treatment. For this proposition Hufford cites *State, ex rel. Iowa Department of Health v. Van Wyk,* 320 N.W.2d 599, 606 (Iowa 1982), where we said: "as a matter of privacy persons enjoy a fundamental right to seek or reject medical treatment generally." Nevertheless, we also said in the next sentence: "it does not follow, however, that there is a fundamental right to select a particular treatment or medication."

Initially, Hufford's argument presents the spectacle that this right of a patient

can be engorged by the dentist from the patient who is complaining of the treatment and then used as a shield from the complaint. Such a perversion would totally skew the purpose of the rule to afford protection to a patient. Furthermore, the second sentence quoted above is more supportive of the board's position than is the first sentence helpful to Hufford. We hold that a medical practitioner may not rely on a patient's right of privacy in seeking unconventional treatment to escape discipline for acts that are harmful to the patient.

### E. *Consent to Treatment.*

■ The purported written consent given by Thompson was found by the board to be an uninformed consent. The evidence supporting this is overwhelming.

### F. *Fraud.*

Hufford also asserts that all of the elements of fraud were not found by the board so that that count against Hufford is invalid, citing *Hall v. Wright*, 261 Iowa 758, 156 N.W.2d 661, 666 (1968). Our review convinces us that all of the indicia of fraud were found by the board, either explicitly or implicitly, and are thoroughly substantiated by clear, satisfactory and convincing evidence.

### VIII. *Findings for Sanctions.*

■ Finally, Hufford believes that the board's sanctions were unauthorized because it made no findings as to the appropriateness of sanctions. This is likened to our rule of civil procedure 118 and Iowa Code section 17A.15 (1987), that require the judge to make specific rulings.

Again we find the point missmarked. The board's authority under the statute is extremely broad. It may suspend or revoke a dentist's license for any of twelve enumerated reasons. *See* Iowa Code § 153.34 (1987). The findings of fact, in the absence of fraud, are conclusive. *See* Iowa Code § 153.33(4)(g) (1987). There is no Code requirement as suggested by this argument. The provisions of chapter 153 are to be construed liberally to carry out its purpose to protect the public health, safety and welfare of the people of Iowa. *See* Iowa Code § 153.35 (1987). We hold that the authority to impose conditions during the suspension period is subsumed in the board's broad authority to suspend or revoke a license and need not be graced with specific findings.

We have considered all other contentions raised by Hufford in this matter and deem them less meritorious than those discussed. The board of dentistry has admirably performed its duty to uphold the high standards of this profession.

DISTRICT COURT JUDGMENT REVERSED.