Vincent J. GLOWACKI, Appellant.

v.

**STATE OF IOWA BOARD OF MEDICAL EXAMINERS,**
Appellee.

No. 93–264.

Supreme Court of Iowa.

May 25, 1994.

Charles W. Brooke of Noyes, O'Brien, Gosma & Brooke, Davenport, for appellant.

Bonnie J. Campbell, Atty. Gen., and Theresa O'Connell Weeg, Asst. Atty. Gen., for appellee.

SNELL, Justice.

This is a judicial review case under Iowa Code section 17A.19 challenging the decision of the Iowa Board of Medical Examiners. On October 25, 1990 the board filed a complaint against Dr. Vincent J. Glowacki for his record-keeping practices in forty-three cases in 1985 and 1986 in which he provided post-operative intensive care to open-heart patients. On August 8 and 9, 1991 a panel of four members of the board heard evidence and on November 19, 1991 filed their findings of fact, conclusions of law, proposed decision, and order. That order proposed that Glowacki should be suspended for ninety days and serve a two-year period of probation.

Glowacki appealed asking for a full hearing before the board. The full board met, heard arguments, and on June 18, 1992 issued its

decision which adopted the panel's earlier decision. Glowacki then took judicial review to the district court which affirmed the board's decision. In an interlocutory appeal to our court we held that Dr. Glowacki was entitled to a stay of the disciplinary order until final disposition of his court case. *Glowacki v. Board of Medical Examiners*, 501 N.W.2d 539, 542 (Iowa 1993). We have now reviewed this matter on final appeal, and we reverse and remand.

Our standard of review is set by Iowa Code section 17A.19(8) (1989). On judicial review, we may reverse or modify the board's decision if one of seven statutory grounds exists. Of those grounds petitioner Glowacki alleges that his procedural due process rights were violated, the standard of conduct is unconstitutionally vague, the decision is not supported by substantial evidence, and an erroneous legal standard was applied.

### I. *Background Facts.*

Dr. Vincent Glowacki is a medical doctor practicing anesthesiology in Davenport, Iowa. On October 25, 1990 the Board charged him with knowingly making misleading, deceptive, untrue, or fraudulent statements in the practice of medicine, with committing an act contrary to honesty, and with willfully and/or repeatedly violating the statutes or rules governing the practice of medicine in Iowa. These charges arose because of the way Glowacki recorded the time spent with a patient on the hospital anesthesia records and on his office billing records. All of the charges related to cases treated in 1985 and 1986.

In 1985 and 1986 anesthesiologist Glowacki, with help from his certified nurse anesthetists, provided operative anesthesia and post-operative respiratory and pulmonary care for open-heart patients at St. Luke's Hospital in Davenport. Because the patients had been anesthetized heavily they could not breathe on their own. After surgery they were taken to the intensive care unit (ICU), where they were placed on a respirator and given other critical care. This pulmonary care was continuous but Dr. Glowacki's role in it was intermittent, as necessitated by each patient's condition. Final ex-

tubation (removal of the breathing tube) by Glowacki and his release of each patient to the care of the ICU nurses varied in time from a short time to as long as five-and-a-half hours after the operation. Glowacki wrote down the total amount of time he actually spent with each patient on a card.

Pulmonary care for open-heart patients by anesthesiologists was rare in those years. Dr. Glowacki received specialized training in it at the University of Iowa Medical School in addition to having received normal anesthesia training. Patients were drugged to stop their hearts and lungs which required a doctor to breathe and care for them after the operation. Until the open-heart patients' conditions stabilized, Dr. Glowacki attended to them post-operatively. Between 1973 and 1985 Dr. Glowacki was the only doctor providing such care at St. Luke's Hospital. St. Luke's was the only Iowa hospital, other than the University of Iowa Hospital, performing open-heart surgery at that time. Glowacki was the only doctor then providing this type of care at St. Luke's. In later years pulmonologists came to provide this care.

In the usual surgery case not involving heart surgery an anesthesiologist provided anesthesia in the operating room and when the patient was taken to the recovery room, the anesthesiologist's personal attendance ended. Heart patients, by contrast, often continued to require a doctor's care long after the surgery. Sometimes it required several hours of care in the ICU to stabilize the patient before being taken to a recovery room.

When Glowacki judged that the open-heart patient's condition was stable he then turned the patient over to the ICU nurses. His personal attendance at the patient's side after the operation did not need to be continuous beyond the first half-hour or so. Glowacki could start giving anesthesia care to a second patient even though his first patient would need further post-operative care. Glowacki, like other doctors, sometimes cared for several patients intermittently, dividing his time between them.

The blanks on the patient cards used by Glowacki called for a start time and an end

time. Glowacki put down his actual start time and then added the number of minutes or elapsed time that he had spent. As a result of this record-keeping practice, in twenty-one cases in 1985 and 1986, the end time written on the first card was later than the start time written on the subsequent card for another patient.

The cards Glowacki used were not designed to accept multiple or intermittent times. They had one blank for a start time and one blank for an end time. Glowacki was having multiple start and end times per patient. However, it was the total or elapsed times calculated that Glowacki used to prepare bills.

An appearance of impropriety was created from this method of entering data because Glowacki's total minutes or elapsed time were written down on the cards corresponding to the actual time of day. To one looking at the cards it appeared that Glowacki was charging two people for some of the same time. Glowacki actually was caring for two people intermittently and recording for each only the minutes of care given to each patient. The practice used by Glowacki was done openly and was admitted by him as a matter of practice.

Glowacki's medical records for these cases show that he provided pulmonary care and was in personal attendance with these patients for the amount of time he claimed. The evidence shown as to when Glowacki left any patient for the final time in the care of the ICU nurses was the extubation time which was often several hours after the operation.

The board concluded that Glowacki's pulmonary care was not included within the meaning of the term "anesthesia time" and therefore he should not have entered it on the cards as he did. The board concluded that the "anesthesia time" for each patient ended at the first moment Dr. Glowacki left the patient's side and could not be resumed.

Much of the controversy in this case circles around the meaning of "anesthesia time." The board applied the following definitions in reaching its decision:

> Anesthesia time begins when the anesthesiologist begins to prepare the patient for anesthesia care in the operating room or in an equivalent area, and ends when the anesthesiologist is no longer in attendance, that is, when the patient may be safely placed under post-operative supervision.

American Society of Anesthesiologists, *Relative Value Guide* at vi (1985);

> Anesthesia time begins when the anesthesiologist begins to prepare the patient for the induction of anesthesia in the operating room or in an equivalent area and ends when the anesthesiologist is no longer in personal attendance, that is, when the patient may be safely placed under post operative supervision. . . .

American Medical Ass'n, *Physicians' Current Procedural Terminology* 65 (1990);

> Anesthesia time begins when the anesthesiologist or anesthetist is first in attendance with the patient for the purpose of administering an anesthetic (induction) and ends when the anesthesiologist or anesthetist is no longer in personal attendance, i.e., when the patient may be safely placed under customary post-operative recovery room, supervision. . . .

*Medicare B/On Record,* Anesthesiology Guidelines (Blue Cross/Blue Shield of Iowa) June 3, 1983; Blue Cross/Blue Shield of Iowa, *Medicare Medical Assistance Manual* 3 (July 1985).

In its conclusions of law the board stated that "anesthesia time," as it related to the open-heart patients treated by the respondent, began when the respondent prepared each patient for the induction of anesthesia and ended when the respondent established and left each patient in the care of the ICU. The board held that on the anesthesia records of numerous patients Glowacki knowingly made misleading, deceptive, and untrue representations in the practice of medicine by misstating the "finished" time on the anesthesia records and the "anesthesia time" on the billing cards. These acts were found by the board to violate Iowa Code section 148.-6(1)(g) (1985) and 470 Iowa Administrative Code r. 135.204(12) (1984) which permit discipline for acts "contrary to honesty." The board further found that these acts by Glo-

wacki were willful and repeated and as such were subject to discipline under Iowa Code section 147.55(8) (1985), section 148.6(1)(i) (1985), and 470 Iowa Administrative Code r. 135.204(14) (1984).

The discipline ordered by the board was a suspension of license to practice medicine for a period of ninety days. Additionally, a probationary period of two years was ordered during which time records would need to be made available to the board staff regarding medical and billing records for hospital services provided by Glowacki.

## II. Contentions of Parties.

Glowacki's response to all of the charges made was to admit doing the acts specified but to deny any wrongdoing. He asserts that the term "anesthesia time" was never meant to be a record-keeping standard but is instead a billing standard. It reflects the time spent taking care of the patient before, during, and after surgery including the time spent by the doctor checking on the patient after delivery to the ICU. The board asserts that "anesthesia time" ends when the doctor leaves the patient in ICU and attends a second patient. Glowacki argues that the patient is not totally left to the care of the ICU staff when he leaves to care for a second patient because it is necessary to return periodically to check the progress of the first patient and give additional care.

The problem surrounding the meaning of "anesthesia time" comes from the need for additional post-operative care for open-heart surgery patients. Care for other surgery patients by the anesthesiologist routinely ends when the patient is transferred to the recovery room. Open-heart surgery patients, by contrast, are not taken immediately to a recovery room, but are taken instead to the ICU for more intensive care. For some time prior to 1984 Glowacki had been paid for the post-operative care by billing according to a "K code." When the insurance company standards changed so that these charges were no longer accepted as K code charges, he looked for another code under which these charges could be made. He concluded that he could add the time for these post-operative services as an aggregate to anesthesia time so that he would be compensated for the work performed.

## III. Standard of Review.

On our review of agency actions, we do not review de novo but function solely in an appellate capacity to correct errors of law on the part of the agency. *Board of Dental Examiners v. Hufford,* 461 N.W.2d 194, 198 (Iowa 1990); *Hussein v. Tama Meat Packing Corp.,* 394 N.W.2d 340, 341 (Iowa 1986); *Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n,* 359 N.W.2d 491, 495 (Iowa 1984). An appeal of a district court decision is governed by Iowa Code section 17A.20. The scope of review under this section is limited to determining whether the district court correctly applied the law in exercising its section 17A.19(8) judicial review function. *See Conoco, Inc. v. Iowa Dep't of Revenue & Fin.,* 477 N.W.2d 377, 379 (Iowa 1991); *Abel v. Iowa Dep't of Personnel,* 472 N.W.2d 281, 282 (Iowa 1991). In making that determination, we apply the section 17A.19(8) standards to the agency action to determine whether its conclusions are the same as those of the district judge.

Because fact finding is delegated to agencies by chapter 17A, we defer to an agency's fact finding if supported by substantial evidence. *Larson v. Employment Appeal Bd.,* 474 N.W.2d 570, 572 (Iowa 1991). Iowa Code section 17A.14(1) states that a finding by the agency shall be based upon the kind of evidence on which reasonably prudent persons are accustomed to rely for the conduct of their serious affairs. We have said that evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion. *McConnell v. Iowa Dep't of Job Serv.,* 327 N.W.2d 234, 236 (Iowa 1982); *City of Davenport v. Public Employment Relations Bd.,* 264 N.W.2d 307, 311 (Iowa 1978); *Schmitz v. Iowa Dep't of Human Servs.,* 461 N.W.2d 603, 605–06 (Iowa App.1990).

## IV. Evidentiary Record.

The record discloses testimony by three anesthesiologists besides Dr. Glowacki regarding record-keeping practices. Dr. Marvin Silk, who practices at Mercy Hospital in Des Moines, stated that he essentially

charges for the time spent with a patient. He stated that early extubation generally means within two-to-four hours after surgery. The nurses do the extubation after calling the doctor, giving the patient's condition and receiving the doctor's decision to extubate or ventilate the patient. He stated that normally he does not bill for the twenty-four-hour period after surgery in open-heart cases because he considers that as part of the base surgery cost. He stated that there was no question that the post-operative management time spent on the patient by the anesthesiologist is proper billable time and should be compensable. It was not correct or appropriate, however, in Dr. Silk's opinion, to add it to anesthesia time because the reimbursement is different.

Dr. William Dipple, called by Dr. Glowacki, who practices in Davenport, testified that the quality of care and services provided by Dr. Glowacki over the years has medically been beyond reproach. Dr. Glowacki was considered to have the best cardiorespiratory dynamics of any anesthesiologist in town. In the early years, Dr. Dipple believed the post-operative respiratory care of a heart patient was two or more hours. This was not one continuous period of time following surgery but involved the physician constantly checking on the patient, back and forth. He observed that during a second surgery Dr. Glowacki would consult by intercom with staff in the ICU on the condition of his first patient. Dr. Dipple knew Dr. Glowacki for over twenty years. He found his character to be of the highest and had no reservations concerning his moral or professional standing.

Dr. Alan Sherburne, called by Dr. Glowacki, stated that he practiced anesthesiology at Mercy Hospital in Iowa City. He knew Dr. Glowacki as a resident but had had no contact with him for twenty-five years. He stated that at the time the K codes were used for billing he received a communication from Blue Cross that was a little confusing. He said "they never have been very clear about starting or stopping times in these respiratory care codes and never have been very well defined." He stated:

I myself would have done it differently. I would have used a respiratory care code. But actually in fact that would have been the effect of charging the patient a lot more, because the base currently for respiratory care under the ASA Relative Value Code Guide is a base of ten for the first day, ten units. And the next day it's five units. And at the time that Dr. Glowacki—I understand this covers roughly the mid-eighties—there was another code from the Iowa Relative Value Guide which most people in Iowa were using at that time, and it had a base of seven plus time.

This was the K code which also allowed charging extra units for the sickness of the patient, the lateness of the hour, and for other special circumstances.

Dr. Sherburne stated that adding up the time in aggregate for post-operative respiratory care for the average heart patient would equal at least an hour or two. He described the care as "a series of discontinuous, sometimes inconvenient visits and phone calls and occasional rushing back." He testified that in Des Moines the anesthesiologist drops things quickly and turns it over to a pulmonologist who handles complete respiratory care. He noted that the pulmonologist was not working the next several days for nothing. Regarding the appropriate billing techniques, Dr. Sherburne said:

There are probably—well, I haven't counted them, but four or five different sorts of muddy respiratory care codes and critical care codes that it could have fallen under, and you can make a case that might be logical. And in those cases it would literally pay the physician more than charging as an anesthesia time.

Dr. Sherburne made these statements about determining the proper method for billing services.

Q. Are there situations in which you have questions about how particular services should be billed?

A. Yes and it's very difficult on these critical care things ... and I tried to get through to Medicare to find out how they wanted to charge. And first I called their main number, and that didn't work very well, and you get someone who does a lot

of billing. They said resubmit it to the medical department, and three months later you get back saying "Medical department has reviewed it. We are correct." So you're left sitting, and they also say that if they made a mistake of twenty dollars, they won't correct it. You have to make one hundred dollars worth of mistakes before you can even have a hearing.

Q. Are there ever situations doctor in which you talked to professional colleagues with regard to how they handled similar billing dilemmas?

A. It's the blind leading the blind. If you can't call Medicare or Blue Shield and get a straight answer, the people that are paying you, turn to someone else. And they look at this book and say, "I don't know. I sent that charge in and they seem to pay it." And there are a lot of confusing codes here that are very, very similar.

With reference to Dr. Glowacki's adding time as anesthesia time, he said:

It looks to me as if he was finding some way to actually offer reduced fees, and rather than submit a separate charge, which actually would have been more, he just tacked it on. I wouldn't have done that, but I probably would have used the other codes, but there are a lot of different ways to bill for it.

Dr. Gerald Davies, an anesthesiologist practicing in Davenport who had been an assistant professor of anesthesiology at the University of Iowa Hospitals, testified that Dr. Glowacki was a good physician by any standards. He described him as a caring physician, very well-liked and respected with a sound practice. Dr. Davies was asked at what point did he cease billing for actual administration of an anesthesia. His response was:

I think—wouldn't it be reasonable to continue that until you cease to be in personal contact with the patient? That would be reasonable, and that's what I do. The only problem with that is: what if you go back—you know, what if you go back to see the patient maybe two times after you finish anesthesia? How are you going to bill for that? It gets a little bit messy when you are putting in fifteen minutes or

a ten-minute period when in fact you visited the patient a couple of times. And that was Dr. Glowacki's problem. You know, you say you were with the patient from seven until ten thirty, and you visited the patient maybe at one or four in the afternoon for a period of time. You know, including that time in the bill, it just becomes unwielding, messy.

On the question of charges for medical services Dr. Davies estimated that Dr. Glowacki's charges were about one-half of the amount charged at the University of Iowa Hospitals.

In its findings of fact and conclusions of law, the panel of the Board of Medical Examiners noted that three medical doctors testified that Dr. Glowacki was an honest and respected physician. The board's decision also noted Dr. Glowacki's reputation as a competent, caring, and respected physician. The board specifically referred to the question of whether post-operative respiratory services provided to patients undergoing heart surgery could be separately billed or were an integral part of the anesthesia charge. Dr. Silk opined they were an integral part of the anesthesia charge, while Dr. Davies and Dr. Sherburne disagreed. The board thereafter concluded "the board will not resolve the billing dispute among anesthesiologists and, therefore, does not find the respondent guilty of knowingly making fraudulent representations in the practice of medicine." Inherent in this finding is the conclusion that Dr. Glowacki was not guilty of billing for any services to which he was not entitled.

## V. Substantial Evidence Standard.

In its decision the board stresses the importance of the accuracy of medical and billing records prepared by physicians who the public expects to be truthful and honest in preparing records. With this statement there can be no disagreement. The board then concluded that the entries by Dr. Glowacki were made knowingly, not mistakenly, and were misleading, deceptive, and untrue statements.

The board asserts that the "knowingly" element requires only that an act be done and that specific intent is not required. We have not yet decided this issue and deem it unnecessary to decide it now. Since there is no disagreement as to what acts Dr. Glowacki did and why he did them there was no fact resolution for the board to make. In deciding the consequences flowing from those acts by Dr. Glowacki, the board decided that any entries deliberately made in the "anesthesia time" record that could be misleading, absent explanation, are sufficient for sanctions. We believe that under this record more is required to meet the legal requirements of substantial evidence.

The testimony in this record establishes without disagreement that "anesthesia time" ends when the physician no longer is in "personal attendance of the patient." That can occur either when the patient is in the recovery room or the ICU. The doctor may personally attend the patient intermittently over a period of several hours. No claim is made by Dr. Glowacki or anyone else that the post-operative care was continuous or needed to be continuous. In fact, the record establishes that continuous personal attendance by the doctor is unnecessary and would be wasteful.

The evidence presented to establish that the meaning of "anesthesia time" requires that an end time be fixed as soon as the patient is delivered to the ICU comes from the physician whose routine fits that interpretation. A clear demarcation line occurs when the anesthesiologist turns the patient over to a pulmonologist or other ICU personnel and does not return to give further care. But it cannot be said that the doctor has ceased personal attendance on delivery of the patient to the ICU when additional medical care is given thereafter for a period of time.

There is no dispute in this record that Dr. Glowacki rendered the post-operative services to his patients for which he charged. The evidence establishes that he was entitled to be paid. The record shows that the physicians in 1985 and 1986 were unsure of how they should report their post-operative services and sought unsuccessfully to resolve the matter. Although the method chosen by

Dr. Glowacki proved to be unwise, there is no evidence that this caused anyone to be misled to their detriment. Remedial action has been taken by Dr. Glowacki so that postoperative services provided to open-heart surgery patients are no longer included by him under the "anesthesia time" designation.

Our review of the whole record pursuant to section 17A.19(8)(f) establishes that the decision in this matter is not supported by substantial evidence. For this reason the order of the Board of Medical Examiners is reversed. We remand for disposition in accordance with this decision.

**REVERSED AND REMANDED.**

All Justices concur except HARRIS and LARSON, JJ., who dissent, and TERNUS, J., who takes no part.

HARRIS, Justice (dissenting).

In this review of agency action the state board of medical examiners ordered a ninety-day suspension of the medical license of respondent Vincent J. Glowacki. The complaint against Glowacki stems from what the board found to be dishonest billing practices in adding professional service time to hospital and office billing records. The record is clear and undisputed that time overlaps, inappropriately called "anesthesia time," were entered in order for Glowacki to compensate himself for postoperative care in open-heart surgeries after his "anesthesia time" with patients had ended.

Substantial evidence, indeed overwhelming evidence, supports the board's finding. The majority nevertheless overturns this administrative determination by way of holding, apparently as a matter of law, that the definition, widely recognized among professional anesthesiologists, is inappropriate. So doing the majority thwarts the medical board's proper and commendable attempts to protect the public from dishonest billing practices in the medical profession. Moreover the majority holding, because it is in practical effect a de novo review, is a direct affront to the most basic canon of administrative law. *Leonard v. Iowa State Bd. of Educ.*, 471 N.W.2d 815, 816 (Iowa 1991) ("judicial second-guessing of agency wisdom would destroy the fabric of

administrative law"). The propriety of recognizing this billing policy should remain within the domain of the medical board, and should not be arrogated by this court.

Anesthesia time is a term of art established in the record by testimony and by documents of the American Society of Anesthesiologists, the Physician's Current Procedural Terminology, and by definitions promulgated by the Health Care Financial Administration, the federal agency that administers medicare and medicaid programs. This testimony and these definitions make it clear that the postoperative care in a recovery room for which Glowacki billed as "anesthesia time" fell outside the recognized definition. Glowacki simply chose to disagree with it, billed in accordance with this disagreement, and altered hospital records to reflect his billing.

Glowacki does not dispute the fact that "anesthesia time" has been defined in accordance with the board's finding. He admits being aware of it. In filing his claims he nevertheless certified his bills were in accordance with accepted policy. His lame excuse is his view, shared by two of his professional witnesses, that the policy was wrong, that the postoperative treatment should count as "anesthesia time." The State presented an equally competent anesthesiologist, one whose testimony the board was clearly entitled to accept, who disagreed and thought the recognized definition was correct.

It should be for the board, not for the majority of this court, to settle the definition of "anesthesia time." In all respect I am astonished that the majority is willing to intrude into what is clearly an administrative matter. And I am dismayed that the majority would do so in a matter where the administrative board is so eminently correct in defending the public interest. I would adopt the following from its decision:

> The citizens of this state rely on the accuracy of medical and billing records prepared by their physicians and expert physicians to be truthful and honest in preparing the records. The board concludes that the respondent, who knowingly, not mistakenly, made misleading, deceptive, and untrue statements and committed acts con-

trary to honesty when he prepared medical and billing records, committed serious violations of statutes and rules related to the practice of medicine that reflect adversely upon his professional conduct.

The trial court was correct in refusing to interfere. I would affirm.

LARSON, J., joins this dissent.